Hillsborough-southern judicial district
No. 2004-283

THE STATE OF NEW HAMPSHIRE

v.

BRANDON YATES

Argued: April 5, 2005
Opinion Issued: May 23, 2005

246

*Kelly A. Ayotte*, attorney general (*Ann M. Rice*, associate attorney general, on the brief and orally), for the State.

*David M. Rothstein*, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

BRODERICK, C.J. The defendant, Brandon Yates, was tried before a jury in Superior Court (*Hicks*, J.) on two counts of aggravated felonious sexual assault (AFSA), *see* RSA 632-A:2 (Supp. 2004); two counts of felonious

sexual assault (FSA), *see* RSA 632-A:3 (Supp. 2004); one count of sexual assault, *see* RSA 632-A:4 (Supp. 2004); two counts of endangering the welfare of a child, *see* RSA 639:3 (Supp. 2004); and four counts of prohibited sales, *see* RSA 179:5 (2002). The jury found the defendant guilty of one endangerment charge, all four charges of prohibited sales and one charge of FSA, and acquitted him of the remaining charges. On appeal, the defendant challenges his convictions for FSA and endangering the welfare of a child, arguing that the trial court erred in allowing the State to play the tape of a 911 call at trial, and in failing to dismiss the endangerment charge. We affirm in part, reverse in part, vacate in part, and remand for resentencing.

A jury could have found the following facts. In mid-afternoon on November 2, 2002, the fourteen-year-old victim and three of her juvenile friends met with the defendant, who was then eighteen years old, at the Memorial School in Hudson. The group gathered in the woods behind the school, and the defendant produced a bottle of vodka from his backpack. The victim drank more of the vodka than anyone else. At some point, the group went further into the woods and up a small hill, where the defendant built a fire. Thereafter, the victim began to appear impaired. She slurred her words, talked nonsensically and had difficulty walking.

Several members of the group tried to assist the victim to the school so she could call her mother, but she kept falling and was unable to walk down the hill. Eventually, they abandoned their efforts and returned the victim to the fire. Two of the victim's friends then left, at which time the victim was lying on the ground near the fire with her eyes closed, not responding when people spoke to her.

At approximately 5:00 p.m., a third member of the group, Amy, left the woods to call her mother, Laurie M. The defendant remained behind with the victim. Amy was unable to find a working pay phone nearby, so she walked home and called her mother at work to tell her that the victim was in trouble and to ask her to come home. When Ms. M. arrived, she and Amy went to the woods and called for the victim and the defendant. They heard no response, and returned home to get a flashlight. Amy's stepfather, Joseph M., accompanied them on their return to the woods.

After several minutes of searching, they found the victim lying on the ground, approximately three feet away from a pile of burning embers remaining from the fire. The victim was wearing pajama bottoms, which were pulled down by her ankles. Her shirt was off, her bra was up near her neck, and she was not responsive. The defendant was gone. It was very cold outside, so Mr. and Ms. M. covered the victim with their coats. Ms. M. then used her cell phone to call the victim's mother and 911. After speaking briefly with the 911 operator, Ms. M. handed the cell phone to

her husband so that he could remain on the line with 911 while she met emergency response personnel to direct them to the victim.

The victim was transported to St. Joseph's Hospital. At the hospital, Joanna Rix, a registered nurse and a certified sexual assault nurse examiner, treated the victim. The victim was initially unresponsive to loud voices, shaking, touching and a "sternal rub."

About two hours later, while the victim was still unresponsive, Ms. Rix performed a sexual assault examination using a rape kit. Ms. Rix observed bits of dead leaves, moss, grass and other types of woodland debris in the victim's navel, between her buttocks and in her genital area. She also observed fresh injuries to the victim's genital area.

At approximately 12:30 a.m. on November 3, two detectives from the Hudson Police Department arrived at the defendant's house and told him that they wanted to speak with him concerning the events of the previous evening. At their request, he accompanied them to the Nashua Police Department. When questioned by the police, the defendant admitted to being in the woods behind the Memorial School with the group of teenagers, and to providing them with alcohol. Although he initially denied having any sexual contact with the victim, the defendant eventually admitted, both orally and in writing, to such contact. When asked about the victim's level of impairment, the defendant responded that on a scale of one to ten, with ten being the most impaired, he thought she was an eight or nine.

Prior to trial, the defendant moved to exclude the tape of the 911 call, based, in part, on his contention that the prejudicial effect of the tape outweighed its probative value. The court ordered the State to edit the second half of the tape, containing Mr. M.'s conversation with the 911 operator, and allowed the State to play for the jury only Ms. M.'s conversation. Both before and after the State played the tape, the trial court gave the jury limiting instructions. The trial court denied the State's request to play the tape during its closing argument, and also denied the State's request to admit the tape into evidence as a full exhibit. At the close of the State's case, the defendant moved unsuccessfully to dismiss both charges of endangering the welfare of a child, arguing that he did not owe the victim a "duty of care" within the meaning of RSA 639:3.

I

Relying upon New Hampshire Rule of Evidence 403 and *State v. Jordan*, 148 N.H. 115 (2002), the defendant first argues that the trial court erred in allowing the State to play the 911 tape for the jury. Although he concedes that Ms. M.'s statements during the 911 call qualified as excited utterances under New Hampshire Rule of Evidence 803(2), he maintains

that the tape lacked probative value because: (1) several witnesses, including Ms. M., testified to the same information about the victim's physical condition contained on the tape; and (2) Ms. M.'s statements were not a contemporaneous account of the events underlying the charged offenses. He contends that the tape was unfairly prejudicial to his case because: (1) Ms. M. offered an opinion during the 911 call that she could not have offered as a witness testifying at trial, namely, that the victim appeared to have been "sexually abused"; and (2) the 911 operator referred to the victim being "sexually abused," and asked Ms. M. whether the "attacker" was still nearby, twice reinforcing the conclusion that the defendant was guilty of assaulting the victim. Thus, according to the defendant, the prejudicial effect of the tape substantially outweighed its probative value, and was not sufficiently mitigated by the trial court's limiting instructions to the jury, its ruling that the State could not play the tape during its closing or its ruling that the State could not admit the tape as evidence.

The State, for its part, argues that the trial court did not err in allowing the tape to be played because Ms. M.'s description of the victim's physical condition, conveyed just a short time after the defendant had left her in the woods, demonstrated how the victim may have appeared at the time of the assault and abandonment. The State maintains that the tape was therefore relevant to material elements of the two AFSA charges and the two endangerment charges: (1) whether the victim was physically incapacitated; and (2) whether the defendant knew of her condition.

We accord the trial court considerable deference in determining the admissibility of evidence, and we will not disturb its decision absent an unsustainable exercise of discretion. *State v. Jordan*, 148 N.H. 115, 117 (2002). To demonstrate that the trial court exercised unsustainable discretion, the defendant must show that the ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.*

New Hampshire Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, evidence that is relevant may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. N.H. R. Ev. 403; *State v. Hall*, 148 N.H. 671, 675 (2002). As we explained in *Jordan*:

> Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on

something other than the established propositions in the case. Unfair prejudice is not, of course, mere detriment to a defendant from the tendency of the evidence to prove his guilt, in which sense all evidence offered by the prosecution is meant to be prejudicial. Rather, the prejudice required to predicate reversible error is an undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged.

*Jordan*, 148 N.H. at 117-18 (quotation, citation and brackets omitted).

In *Jordan*, we upheld the trial court's decision to admit into evidence a redacted 911 tape. *Id.* at 117-18. In that case, the defendant's wife instructed her daughter, Erica, to call 911 after the defendant hit a man who was at the house and pushed his wife to the ground, fracturing her arm, such that she could not get up off the ground. *Id.* at 116. Erica told the 911 operator that "my father came home drunk . . . and he slammed my mother on the ground," and further stated that her father "was punching this guy who was helping us." *Id.* (brackets omitted). At trial, the court permitted the State to play the tape to the jury in its opening statement, during its case-in-chief and in its closing argument. *Id.*

While we expressed our concern at the number of times the prosecution played the tape during trial—an issue that the defendant did not contest, and therefore an issue we did not consider on appeal—we determined that the record supported the trial court's decision to admit the tape into evidence. *Id.* at 118-19. Specifically, we concluded that the record supported the trial court's finding that the tape was highly probative of the defendant's involvement in the altercations because the tape was "as contemporaneous an account of the events as they occurred as possible." *Id.* at 118. Furthermore, because several of the State's witnesses, including Erica, were hesitant to testify against the defendant, we noted that the probative value of the tape was strengthened. *Id.*

As to whether the danger of unfair prejudice to the defendant substantially outweighed the probative value of the tape, we disagreed with the defendant's assertion that Erica was "hysterical" throughout the call, and instead concluded that she was "fairly calm and lucid at times, answering questions posed to her and following instructions." *Id.* Finally, we noted that because the trial court redacted various prejudicial statements from the tape, any prejudicial effect on the defendant was sufficiently minimized. *Id.*

The circumstances of this case are readily distinguishable from *Jordan*. Unlike the 911 call in *Jordan*, which occurred so close in time to the assaults that the defendant's wife was still unable to get up off the ground,

Ms. M.'s call to 911 occurred approximately fifty-four minutes after Amy left the defendant and the victim in the woods. There is no evidence indicating when during that period of time the assault occurred. Moreover, in speaking with the 911 operator, Ms. M. was only able to describe what she observed after the fact of an alleged assault that she did not witness, unlike Erica, who was able to describe the assaults moments after they occurred, apparently based upon her own observation of them. Additionally, unlike in *Jordan*, there is no evidence that any one of the State's witnesses in this case was reluctant to testify against the defendant. Finally, Ms. M. and at least three other witnesses testified about the victim's appearance at the scene based upon observations they made either at the same time, or only minutes after, Ms. M. called 911. Thus, unlike *Jordan*, the record in this case does not indicate that the 911 tape was "highly probative." *Id.*

Furthermore, in this case, the trial court exercised unsustainable discretion in finding that the danger of unfair prejudice did not substantially outweigh the minimal probative value of the tape. The State posits that Ms. M.'s conversation with the 911 operator is "not highly emotional," and notes that although she is "distraught," she "is neither crying nor screaming" during the call and answers the 911 operator's questions in a "calm and coherent manner." Having listened to the tape, we agree with the State that Ms. M. was distraught. Although she was not crying or screaming, she appears to be yelling and out of breath. On several occasions, the 911 operator has to tell her to "stay on the line," as though attempting to keep her focused on the operator's questions and instructions. Thus, while the tape may not be so unduly emotional as to inflame a jury, it is considerably more emotional than the State suggests.

The unfair prejudice inherent in the 911 tape in this case comes not from the emotional nature of the call, however, but from the content of the discussion between Ms. M. and the 911 operator. Specifically, when asked the nature of the emergency, Ms. M. tells the 911 operator that a "little girl" is in the woods and opines that she "appears to be sexually abused." The 911 operator asks if "the attacker" is still there, and when speaking to the ambulance attendant, repeats Ms. M.'s opinion that the victim "appears to be sexually abused." These criminal characterizations and opinions, the likes of which were not present on the 911 tape in *Jordan*, are highly and unfairly prejudicial.

In *Jordan*, Erica recited to the 911 operator the facts she observed. Here, however, the jury was presented not only with Ms. M.'s factual description of the victim as she appeared, but also with her opinion that the victim was "sexually abused." Such opinion, as the trial court recognized, was inadmissible.

■ Thus, weighed against the minimal probative value of the tape, the danger of unfair prejudice was substantial. Accordingly, we conclude that the defendant has met his burden of demonstrating that the trial court's decision to allow the State to play the tape to the jury was "clearly untenable or unreasonable to the prejudice of his case." *Id.* at 117.

The State contends that any potential unfair prejudice to the defendant's case was minimized by the trial court's limiting instructions to the jury, and its rulings that the State could not play the tape during its closing or move the tape into evidence as a full exhibit. We disagree.

Prior to playing the tape, the trial court instructed the jury:

> Ladies and gentlemen, you're about to hear portions of a 911 tape. In some respects, many respects, the 911 tape contains—its content, rather, is exactly what you would expect. There are, however, on the tape certain conclusions and/or characterizations drawn by the participants to the conversation. You are not to draw any inference at all, in fact, you are to disregard any conclusions drawn by the participants in this particular 911 tape. The conclusions in this case are to be drawn only by you. As an aid to you in how to follow this instruction, I suggest to you that you—and I don't suggest to you, I'm instructing you, not to consider any of the statements made by the 911 emergency operator as evidence in this case. Thank you, ladies and gentlemen.

After the State played the tape, the court again instructed the jury:

> Ladies and gentlemen, once again, you are to draw no adverse inference toward [the defendant] from any of the conclusions or characterizations that were made or drawn by the participants in that phone call, and again as an aid to you in your deliberations, do not consider any of the statements of the operator, the 911 operator in any way.

Juries are presumed to follow instructions. *State v. Pelkey*, 145 N.H. 133, 137 (2000). Presuming the jury did so in this case, there was nothing left on the tape for it to consider except Ms. M.'s description of the victim's appearance upon her arrival at the scene. However, Ms. M., as well as at least three other witnesses, testified at trial about the victim's condition and appearance at the scene, and they were not cross-examined as to their ability to accurately recall. Consequently, the tape was, at best, minimally probative and, furthermore, it was unnecessary cumulative evidence. *Cf.* N.H. R. Ev. 403 (relevant evidence may be excluded if probative value

substantially outweighed by consideration of "needless presentation of cumulative evidence").

Additionally, and perhaps most importantly, the limiting instructions indicate that the trial court itself believed portions of the tape were inadmissible and yet, notwithstanding that belief, the court let the jury hear the tape. In so doing, the trial court unnecessarily exposed the jury to evidence that was unfairly prejudicial to the defendant, even though that situation could have been avoided. In the interest of avoiding similar situations in the future, we take this opportunity to exercise our supervisory authority and provide instructions to trial courts in their use of 911 tapes. *See* N.H. CONST. pt. II, art. 73-a.

■ Trial courts must exercise caution in their rulings relative to the use of 911 tapes, because although such tapes may be relevant, they require appropriate safeguards. Thus, if a 911 tape itself can be edited to eliminate inadmissible evidence, that should be done. Where editing is not possible, the tape of a 911 call should be transcribed and redacted, unless special circumstances dictate otherwise.

In this case, it was not possible to further edit the tape, and the record reveals no special circumstances that would have prevented the trial court from directing the State to transcribe the tape and redact the offending passages. Doing so would have eliminated the possibility that the jury would be unable to erase from its collective memory the unfairly prejudicial content of the tape, and would have preserved for the jury's consideration only that which lacked any danger of unfair prejudice. Moreover, the use of a redacted transcript would have tempered the emotional nature of the call, which, as stated, may not have risen to a level that would inflame the jury, but which was nevertheless significant.

■ Accordingly, we conclude that the trial court's limiting instructions to the jury were not sufficient to minimize any unfair prejudice to the defendant. Furthermore, considering the *de minimis* probative value of the tape, the significant danger of unfair prejudice, and the insufficiency of the trial court's instructions to the jury, we conclude that any unfair prejudice to the defendant resulting from the State playing the tape once was not mitigated by either the fact that the State was not permitted to play it again or the fact that the tape was not admitted into evidence as a full exhibit.

■ The State argues that any error in allowing the State to play the tape was harmless beyond a reasonable doubt because the tape was not "overly emotional," the evidence was "cumulative and unobtrusive" and, based

upon the acquittal verdicts, the tape did not make a significant impression on the jury. We agree.

It is well settled that the erroneous admission of evidence is harmless only if the State proves, beyond a reasonable doubt, that the verdict was not affected by the admission. *State v. Thompson*, 149 N.H. 565, 567 (2003). An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. *Id.*

Here, we cannot say that the verdict was affected by the 911 tape. Indeed, the jury acquitted the defendant on both charges of AFSA, one charge of FSA and one charge of sexual assault. The sole FSA charge upon which the defendant was convicted alleged statutory rape by digital penetration, *see* RSA 632-A:3, II (1996), thus evidencing that the jury was swayed by the defendant's theory of the case, which was that the victim was not, at the time of the assault, physically incapacitated, unconscious or otherwise helpless to resist. We conclude, therefore, that although the trial court erred in allowing the State to play the 911 tape at trial, the error was harmless.

## II

The defendant next argues that the trial court erred in denying his motion to dismiss the charge of endangering the welfare of a child because he did not owe the victim a "duty of care" within the meaning of RSA 639:3, I (1996). We agree.

The endangerment charge upon which the defendant was convicted reads, in pertinent part, that the defendant:

> did knowingly commit the crime of Endangering the Welfare of a Child, [the victim,] a child under the age of 18 in that while [the victim] was incapacitated due to alcohol and drug consumption [the defendant] disrobed her by pulling her pants down near her ankles and removing her top then left her alone in the woods on a night when the temperature was below freezing thereby endangering her welfare in that she could have been injured or died from exposure. By doing so, [the defendant] did violate a duty of care he owed to [the victim] said conduct being contrary to RSA 639:3 (I) and against the peace and dignity of the State.

RSA 639:3, I, provides:

> A person is guilty of endangering the welfare of a child or incompetent if he knowingly endangers the welfare of a child under 18 years of age or of an incompetent person by purposely violating a duty of care, protection or support he owes to such child or incompetent, or by inducing such child or incompetent to engage in conduct that endangers his health or safety.

For purposes of this appeal, the defendant concedes that the State presented sufficient evidence from which a jury could have concluded that he disrobed the victim and left her alone in the woods, and that the victim could have suffered harm as a result of that conduct. He challenges only the application of the term "duty of care" to the circumstances of this case. The defendant's challenge presents an issue of first impression.

In matters of statutory interpretation, we are the final arbiter of legislative intent as expressed in the words of the statute considered as a whole. *State v. MacMillan*, 152 N.H. 67, 70 (2005). Our task is to construe the Criminal Code provisions according to the fair import of their terms and to promote justice. *State v. Rollins-Ercolino*, 149 N.H. 336, 339 (2003). In doing so, we first look to the plain language of the statute to determine legislative intent. *Id.* We will neither consider what the legislature might have said nor add words that it did not see fit to include. *State v. Hofland*, 151 N.H. 322, 324 (2004). We will not interpret a statute to require an illogical result. *Rollins-Ercolino*, 149 N.H. at 341.

The term "duty of care" is not defined in the statute and is subject to more than one reasonable interpretation. *See id.* at 339. Thus, we turn first to the legislative history of the statute to determine the legislature's intent. *Id.*

RSA 639:3, I, is based upon Model Penal Code § 230.4, *see* COMM'N TO RECOMMEND CODIFICATION OF CRIMINAL LAWS, cmts. at 81-82 (1969). Section 230.4 provides: "A parent, guardian, or other person supervising the welfare of a child under 18 commits a misdemeanor if he knowingly endangers the child's welfare by violating a duty of care, protection or support." MODEL PENAL CODE § 230.4, at 444 (Official Draft and Revised Comments 1980). Comment 3 to section 230.4 states, in relevant part:

> Section 230.4 is violated only by an act or omission that contravenes a legal duty imposed upon a parent, guardian or other person supervising the welfare of a child under 18. The duty itself need not be stated in the penal code but may arise from contractual obligation, from settled principles of tort or family law, or from other legal sources. The specification that the actor's conduct must violate a duty of "care, protection or support" makes clear that the provision applies only to those

legal duties arising by reason of the actor's status as a "parent, guardian, or other person supervising the welfare of a child." In other words, Section 230.4 does not authorize conviction of one who endangers the welfare of a child by violating a legal duty owed by all citizens to one another or by violating a duty which a stranger may owe to a minor. To the extent that such actions should be covered, they are defined as crimes in provisions of general applicability elsewhere in the Model Code.

MODEL PENAL CODE, *supra* cmt. 3, at 450-51.

According to the State, the legislature's use of the term "a person" in RSA 639:3, I, rather than "[a] parent, guardian, or other person supervising the welfare of a child under 18," indicates its intent to expand the scope of the statute to include a broader population than those who have a familial, or similar/supervisory relationship with a minor. We disagree.

The comment to section 230.4 quoted above indicates that the term "duty of care" was intended to refer only to those who have a parental or supervisory relationship with a child. Since "duty of care" refers only to those in a parental or supervisory relationship with a child, the limitation in section 230.4 to parents, guardians or "other person[s] supervising the welfare of a child" is arguably redundant. "The legislature is not presumed to waste words or enact redundant provisions and whenever possible, every word of a statute should be given effect." *Marcotte v. Timberlane/Hampstead School Dist.*, 143 N.H. 331, 339 (1999). In drafting RSA 639:3, I, the legislature avoided the apparent redundancy in section 230.4 by imposing liability on "a person" who owes a child a duty of care, thereby excluding the unnecessary limitation that the statute apply only to parents, guardians or others in a supervisory capacity with respect to the child.

■ Moreover, the legislature retained critical language used in section 230.4 in specifying that the "duty" owed under RSA 639:3, I, is one of "care, protection or support." That language "makes clear that the provision applies only to those legal duties arising by reason of the actor's status as a 'parent, guardian, or other person supervising the welfare of a child.'" MODEL PENAL CODE, *supra* cmt. 3, at 451. Thus, we conclude that the legislative history of RSA 639:3, I, demonstrates the legislature's intent to limit criminal liability thereunder to those who have a familial, or similar/supervisory relationship with a minor. Consequently, we disagree with the State's contention that the legislative history of the statute demonstrates that the defendant owed the victim a duty of care.

■ To avoid contradictory statutory interpretations, we next consider other indicia of legislative intent, such as the title of the statute, the statute in the context of its overall statutory scheme and the intent behind similar provisions. *Rollins-Ercolino*, 149 N.H. at 339; *see State v. Woods*, 139 N.H. 399, 400-01 (1995) (considering relevant statutory scheme in interpreting undefined statutory term). RSA chapter 639 is entitled "Offenses Against the Family." The statutes contained in chapter 639 are entitled "Bigamy," RSA 639:1 (1996) (prohibiting marriage to multiple spouses); "Incest," RSA 639:2 (Supp. 2004) (prohibiting marriage, sexual intercourse, or living together under representation of marriage among specified relatives); "Non-Support," RSA 639:4 (Supp. 2004) (imposing liability on one who fails to provide support for spouse, child or other dependent when legally obligated and able to do so); and "Concealing Death of a Newborn," RSA 639:5 (1996) (prohibiting knowing concealment of corpse of newborn child). A review of the titles of these statutes and the prohibitions contained therein demonstrates that the legislature enacted the statutes primarily to address crimes within the family. Therefore, the statutory scheme within which RSA 639:3, I, is located indicates that the legislature intended to impose liability for endangering the welfare of a child only upon persons having a familial, or similar/supervisory relationship with the victim.

The State discounts the significance of the statutory scheme in which RSA 639:3, I, is located, contending that sections II and III of the statute refer to acts that in most instances would involve individuals who have no such relationship with the minor. Section II states, "In the prosecution of any person under this section, the tattooing or branding by any person of a child under the age of 18 constitutes endangering the welfare of such child." RSA 639:3, II (Supp. 2004). Section III provides,

> In the prosecution of any person under this section, the solicitation by any person of a child under the age of 16 to engage in sexual activity as defined by RSA 649-A:2, III for the purpose of creating a visual representation as defined in RSA 649-A:2, IV, or to engage in sexual penetration as defined by RSA 632-A:1, V, constitutes endangering the welfare of such child.

RSA 639:3, III (Supp. 2004).

The acts prohibited in these sections arguably would, in many instances, involve individuals who do not have a familial, or similar/supervisory relationship with a minor. However, section I, in addition to prohibiting a person from endangering the welfare of a child by violating a duty of care, protection or support, also prohibits "[a] person" from endangering the welfare of a child "by inducing such child or incompetent to engage in conduct that endangers his health or safety." The term "duty of care" is

not applicable to the clause in RSA 639:3, I, that prohibits one from inducing a child to "engage in conduct that endangers [the child's] health or safety." The statute is drafted in the disjunctive; liability is imposed when "[a] person ... purposely violat[es] a duty of care, protection or support he owed to such child ... *or* [when a person] induc[es] such child ... to engage in conduct that endangers his health or safety." RSA 639:3, I (emphasis added).

■ Thus, liability for inducing a child to engage in conduct that endangers the child's health or safety does not also require that the actor owe the child a duty of care. Accordingly, liability under the inducement clause of RSA 639:3, I, could be imposed upon any person, and not just those having a familial, or similar/supervisory relationship with a minor. RSA 639:3, II and III merely refer to such other persons, in addition to those who owe a minor a duty of care, by imposing liability for certain acts "[i]n the prosecution of *any person* under this section." (Emphasis added.) Because the majority of the provisions contained in chapter 639 unequivocally pertain to families and family-type relationships, we do not discount the significance of the statutory scheme in which RSA 639:3, I, is located based solely on sections II and III.

The State maintains that the prohibition in RSA 639:3, I, against inducing a child to engage in endangering conduct evidences the legislature's intent to expand the scope of the statute beyond the reach of section 230.4 of the Model Penal Code. We disagree for the reason discussed above: the term "duty of care" is not applicable to the clause in RSA 639:3, I, that imposes liability for inducing a child to "engage in conduct that endangers [the child's] health or safety." Here, the State alleged that the defendant violated a duty of care he owed to the victim, and did not allege that he induced her to engage in conduct that endangered her health or safety. Accordingly, the legislature's inclusion of the inducement clause in RSA 639:3, I, is not relevant to our determination of the scope of the term "duty of care."

Finally, relying upon *United States v. Hatatley*, 130 F.3d 1399 (10th Cir. 1997), the State contends that the defendant, having placed the victim in danger by providing her alcohol to the extent that she became incapacitated, removing her clothing and abandoning her outside in below freezing temperatures while she was still unclothed and unprotected from the cold, "had a legal obligation to safeguard her." The State argues that such a legal obligation comports with the legislature's intended meaning of the term "duty of care" in RSA 639:3, I. *Hatatley*, however, is inapposite.

In *Hatatley*, the defendant was convicted of voluntary manslaughter after beating the victim and abandoning him while he was seriously

injured, drunk and shirtless in the freezing desert. *Hatatley*, 130 F.3d at 1402-03. The court, in rejecting the defendant's argument that the trial court improperly instructed the jury by implying that he had a duty to safeguard the defendant when he did not, stated:

> When a person puts another in a position of danger, he creates for himself a duty to safeguard or rescue the person from that danger. Thus, when a person places another in danger, fails to safeguard or rescue him and he dies, such omission is sufficient to support criminal liability.

*Id.* at 1406 (citation omitted). Thus, the issue in *Hatatley* was not, as it is here, whether the defendant owed the victim a specific statutory duty of care such that he could be held liable for endangering the victim's welfare. Rather, the question presented in *Hatatley* was whether the defendant's omission, or failure to act, was sufficient as a matter of law, under the circumstances of the case, to establish criminal liability for manslaughter.

▮ Having determined that the challenged portion of RSA 639:3, I, imposes liability only upon individuals who have a familial, or similar/supervisory relationship with a child, we conclude that the trial court erred in denying the defendant's motion to dismiss the endangerment charge. Thus, the defendant's conviction under RSA 639:3, I, is reversed. Because evidence of the endangerment conviction may have affected the sentences the court imposed for the defendant's convictions for FSA and prohibited sales, we vacate those sentences and remand for resentencing. *See State v. Rezk*, 150 N.H. 483, 493-94 (2004).

> *Affirmed in part; reversed in part; vacated in part; and remanded for resentencing.*

NADEAU, DALIANIS and DUGGAN, JJ., concurred.