Hillsborough-southern judicial district
No. 2005-332

THE STATE OF NEW HAMPSHIRE

v.

DOUGLAS GIDDENS

Argued: January 11, 2007
Opinion Issued: April 12, 2007

*Kelly A. Ayotte*, attorney general (*John M. Gasaway, Jr.*, attorney, on the brief and orally), for the State.

*David M. Rothstein*, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

GALWAY, J. The defendant, Douglas Giddens, appeals his conviction in Superior Court (*Groff*, J.) of seven counts of aggravated felonious sexual assault, *see* RSA 632-A:2, I(c) (1996 & Supp. 2006), and one count of kidnapping, *see* RSA 633:1, I(d) (1996). We affirm.

The record supports the following. On the night of December 31, 2003, C.M., a young woman, was walking by herself in Milford. As she walked near the center of town, the defendant approached her, walked alongside her, and talked to her, although the two had never met. C.M. alleged that, after a few minutes, the defendant showed her a knife, told her that he would kill her if she screamed, and led her into the woods where he sexually assaulted her. The defendant denied making this threat and contended that the sexual encounter that ensued was consensual. C.M. further alleged that, after the initial assaults, the defendant led her to his car and drove her to another wooded location where he committed additional sexual assaults.

Early the next morning, C.M. reported the assaults to the Milford Police. She described the threats the assailant made, the various wooded locations involved in the assaults, and the assailant's physical appearance. She also described the assailant's vehicle as a reddish or maroon colored, four-door Grand Am or Grand Prix that had an air freshener in the shape of a blue foot hanging from the rearview mirror.

On January 6, Captain Fortin of the Milford Police Department observed a maroon Grand Am drive by. He followed the vehicle and ran a check on its license plate number, which revealed that the car was registered to the defendant, whom Fortin knew used to camp and spend time in wooded areas of Milford ten years earlier. While stopped behind the Grand Am at a traffic light, Fortin observed an object shaped like a sneaker hanging from the Grand Am's rearview mirror. Fortin continued to follow the vehicle as it made a series of turns and entered and exited several shopping plazas without stopping. The vehicle made an abrupt turn without using a turn signal and later made another abrupt turn into a library parking lot and parked. Fortin pulled into the parking lot, blocking the Grand Am from moving. He approached the vehicle and asked the driver, who was the defendant, for his license and registration. After

conversing with the defendant and obtaining further evidence, Fortin arrested him. It was not until after the stop that Fortin noticed that the Grand Am had two rather than four doors.

At the Milford Police Department, a Milford officer interviewed the defendant. Soon thereafter, two officers from the Manchester Police Department interviewed him. The Manchester officers had traveled to Milford to interview the defendant about abductions and sexual assaults in Manchester that were similar to those he had allegedly committed in Milford. The defendant denied involvement in the Manchester crimes. The Manchester officers then asked him about his feelings regarding the sexual assaults that had occurred in Manchester or what the rapist in Manchester was probably thinking about. The record does not contain an exact representation of what the officers asked or what the defendant said in response. The record contains the parties' summaries of the conversation.

Prior to trial, the defendant moved *in limine* to exclude all evidence of his interview with the two Manchester officers, pursuant to New Hampshire Rules of Evidence 401, 402, 403, and 404(b). Following a hearing, the trial court denied the defendant's motion, ruling that evidence of the interview was relevant, that such relevance was not substantially outweighed by unfair prejudice to the defendant, and was not evidence of prior bad acts. The trial court explicitly permitted the admission of evidence regarding the defendant's "statements about what he thinks a rapist would feel or do." The trial court, however, precluded the State from eliciting any testimony regarding the reason that the Manchester Police questioned the defendant, or regarding his prior imprisonment.

Prior to trial, the defendant moved for reconsideration of the court's ruling, arguing that, without the context of the defendant's introductory statement that he learned how rapists think by spending time with them in state prison, the testimony to be presented at trial would sound like the defendant's own thoughts about how to commit a rape. The trial court denied the motion.

Before trial, the defendant also moved to suppress all evidence derived from the stop of his car. He argued that Fortin did not have reasonable, articulable suspicion that he had committed a crime; thus, the stop violated his state and federal constitutional protections against unreasonable searches and seizures. The trial court denied the motion.

At trial, the State called Manchester Police Officer John Patti as a witness. Patti testified that he was contacted by the Milford Police Department and that he and another officer went to the Milford Police Department and met with the defendant. Patti's testimony included the following exchange:

Q. Did you ask [the defendant] if he had any feelings or thoughts about how a potential rapist might go about picking out a victim?

A. Yes, we did.

Q. And what was his response?

A. It was a lengthy part of the conversation. His immediate response was that it wasn't for sexual gratification. It was more for the rush of it all. The rush of trying to find a victim and making sure that you weren't detected.

Q. Did he—did he talk about how someone might go about picking out a victim?

A. Yes. He said he wouldn't just pick out a victim, he would study them first for a short time. However, he made sure to make it clear that he wouldn't go as far as stalking them, maybe just to look for them for a day or so, no longer than a day, so that he wouldn't be detected.

Q. Did he indicate—did he talk at all about any escape possibilities or anything like that?

A. Yes. He said to make sure of—that there were no escape routes for the victim.

Q. Can you tell us what his appearance or demeanor was when he was making this statement to you?

. . . .

A. Okay. That was an intense part of the conversation. His feet were up on the desk, his arms were behind his head, and as he spoke, it was very intense and very personal. His face became red and flushed as, you know, as if involved in intense thought and conversation.

On appeal, the defendant argues that the trial court erred by denying his motion *in limine* and his motion to suppress. We address each issue below.

*I. Motion in Limine*

The defendant's sole argument regarding his motion *in limine* is that the presence of Manchester police questioning him in Milford, and his responses to those questions, conveyed to the jury that the Manchester police suspected him of sexual assaults in Manchester. Because the

defendant made the statements in the context of questioning by the Manchester police, he argues, the jury could infer that his testimony was not about the rape for which he was on trial, but was about another rape, and thus conveyed his propensity to engage in sexual assault. Thus, the defendant argues, the trial court erred in not excluding Patti's testimony pursuant to New Hampshire Rules of Evidence 403 and 404(b).

We accord the trial court considerable deference in determining the admissibility of evidence, and we will not disturb its decision absent an unsustainable exercise of discretion. *State v. Yates*, 152 N.H. 245, 249 (2005). To demonstrate that the trial court exercised unsustainable discretion, the defendant must show that the ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.*

Rule 404(b) provides, in pertinent part, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." Accordingly, for Rule 404(b) to apply, there must be evidence of a crime, wrong, or act at issue. Here, the defendant does not allege a crime, wrong, or act—only an inference. "Rule 404(b) generally bars evidence of *specific acts* to show character in order to prove conduct on a particular occasion." 2 J. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 404.02[2], at 404-9 (2d ed. 2006) (emphasis added). Since the evidence at issue is simply an inference, we agree with the trial court and conclude that Rule 404(b) does not apply to the challenged evidence in this case.

As the defendant does not challenge the admission of his statements due to their hypothetical nature, we need not address that issue. Likewise, as the defendant does not challenge the admission of his statements because they implied his own thoughts about rape, rather than thoughts that other people described to him, we need not address that issue. The dissent concentrates on these issues without acknowledging that the defendant did not raise them on appeal. Further, the dissent notes that the trial court excluded evidence of the source of the defendant's knowledge regarding how rapists think, but does not acknowledge that the trial court did so at the defendant's request and never prohibited the defendant from eliciting testimony on cross-examination that the defendant was conveying statements that he heard from other people, not his own thoughts.

We now address the defendant's argument under Rule 403, which provides that evidence is unfairly prejudicial

> if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the

established propositions in the case. Unfair prejudice is not, of course, mere detriment to a defendant from the tendency of the evidence to prove his guilt, in which sense all evidence offered by the prosecution is meant to be prejudicial. Rather, the prejudice required to predicate reversible error is an undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged.

*Yates*, 152 N.H. at 249-50. The testimony was unfairly prejudicial, the defendant argues, because the presence of the Manchester officers in Milford implied his personal participation in other, uncharged assaults.

We disagree. The statements made by the defendant show his consciousness of guilt because the methods for committing rape that he described are similar to the events of the alleged rape. C.M. alleged that the defendant forced her to a wooded location to assault her, which is consistent with the defendant's description of a rapist's need to eliminate escape routes for the victim. The defendant also discussed the need for a rapist to study his victim before an assault, which is consistent with C.M.'s description of how the defendant walked beside her and engaged in conversation with her for a few minutes before showing her a knife and beginning the assault. Further, the defendant's demeanor demonstrated that he was speaking from personal experience. The intensity and thoughtfulness that the defendant exhibited by reclining in his chair and becoming flushed suggested the defendant's personal experience with the offense charged. Such evidence was relevant and was probative of his involvement in the charged offense.

■ We see little danger of unfair prejudice to the defendant. The trial court could reasonably have concluded that the presence of Manchester police in Milford would not imply to the jury that the defendant was suspected of additional assaults. The jury heard that the Manchester officers had traveled to Milford, but the jury did not hear why the Manchester officers were there. The statements that the defendant made, such as how a potential rapist might pick out a victim, could easily have been about the rape for which the defendant was charged. Due to the probative value of the testimony, and its lack of unfair prejudice, we cannot conclude that the trial court unsustainably exercised its discretion in denying the defendant's motion to exclude Patti's testimony pursuant to Rule 403.

Further, the defendant did not request a limiting instruction that could have reduced or eliminated any prejudicial inference that the Manchester officers were questioning the defendant because they believed that he had committed sexual assaults in Manchester. *See State v. Martin*, 138 N.H.

508, 519 (1994); N.H. R. Ev. 105. "In the absence of such a request, we cannot conclude that the admission of the evidence was untenable or unreasonable to the prejudice of the defendant's case." *Martin*, 138 N.H. at 519 (citation omitted).

At oral argument, the defendant argued that it would have been futile to request a limiting instruction, because no limiting instruction could have prevented the jury from considering the presence of the Manchester officers for an illegitimate purpose. We disagree.

There are some cases in which a limiting instruction cannot erase from the jury's mind the taint of prejudice caused by testimony of the defendant's involvement in crimes other than those charged. *See State v. Woodbury*, 124 N.H. 218, 221 (1983) (granting a motion for mistrial due to police testimony that the defendant had been previously charged with a crime that was identical to the one for which he stood trial); *State v. LaBranche*, 118 N.H. 176, 178-79 (1978) (granting a motion for mistrial due to testimony from two witnesses that the defendant was allegedly culpable for other instances of criminal conduct closely related to the charge for which he stood trial). We have further held, however, that such cases unambiguously conveyed the defendant's prior criminal conduct to the jury, and that, when there is no such unambiguous conveyance of prior criminal conduct, a limiting instruction is effective. *State v. Sammataro*, 135 N.H. 579, 582-83 (1992). Accordingly, the correct inquiry is whether the prior criminal conduct has been unambiguously conveyed to the jury. *Id.*

██ The evidence of the Manchester officers' presence in Milford to question the defendant did not unambiguously convey prior criminal conduct to the jury. The evidence established, at most, a potential inference of other criminal conduct. Accordingly, we conclude that this is not a case in which a limiting instruction could not erase the taint of prejudice from the jury's mind. We presume that, had the defendant requested a limiting instruction, and had the trial court given it, the jury would have followed it. *Beltran*, 153 N.H. at 652. Thus, we cannot conclude that the defendant has shown that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case.

## II. Motion to Suppress

The defendant argues that the trial court should have suppressed the evidence derived from Fortin's stop of his car because Fortin did not have reasonable, articulable suspicion that the defendant had committed a crime; thus, Fortin violated the defendant's state and federal constitutional protections against unreasonable seizures.

We first address the defendant's claim under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), citing federal opinions for guidance only. *Id.* at 232-33. In reviewing the trial court's ruling, we accept its factual findings unless they lack support in the record or are clearly erroneous. *State v. Wiggin*, 151 N.H. 305, 307 (2004). Our review of the trial court's legal conclusions, however, is *de novo. Id.*

■ Neither party contests that Fortin's stop of the defendant's vehicle in the library parking lot was a seizure. The issue before us is whether the seizure was lawful at the time of the stop.

> To undertake an investigatory stop, a police officer must have reasonable suspicion, based upon specific, articulable facts taken together with rational inferences from those facts, that the particular person stopped has been, is, or is about to be engaged in criminal activity. The suspect's conduct and other specific facts must create a significant possibility of criminality, and the articulated facts must lead to somewhere specific, not just to a general sense that this is probably a bad person who may have committed some kind of crime. To determine the sufficiency of the officer's suspicion, we must consider the facts he articulated in light of all of the surrounding circumstances.

*Id.* at 308 (quotations and citations omitted). The facts that create a sufficient basis to support an investigative stop need not reach the level of those required to support either an arrest or a finding of probable cause. *State v. Galgay*, 145 N.H. 100, 103 (2000).

The facts articulated by Fortin and relied upon by the trial court are as follows. Fortin saw a maroon-colored Grand Am drive by. Based upon his knowledge that C.M. had reported to the police that the vehicle driven by her assailant was a maroon or reddish, four-door Grand Am or Grand Prix, Fortin began following the car. He did not stop the car at that point. He continued to follow it and checked the license plate to determine the car's owner. The check revealed that the car belonged to the defendant, whom Fortin knew was familiar with wooded areas of Milford. Fortin was aware that C.M. reported that the sexual assaults took place in multiple wooded areas of Milford. Fortin continued to follow the vehicle and noticed that an object shaped like a sneaker hung from the car's rearview mirror. Fortin was aware that C.M. reported that her assailant drove a car with a blue air freshener in the shape of a foot hanging from the rearview mirror.

■ The defendant argues that, although his car bore some similarity to the one described by C.M., her description was not so detailed, and the car was not so similar, as to justify the stop. We disagree. Fortin possessed

more than a general sense that the person driving the vehicle had possibly committed some kind of crime. The specific, articulable facts in this case created the reasonable suspicion that the defendant had been involved in a specific criminal activity: the sexual assaults reported by C.M.

The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. *See Wiggin*, 151 N.H. at 308; *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution and uphold the trial court's ruling on the defendant's motion to suppress.

*Affirmed.*

DALIANIS and DUGGAN, JJ., concurred; BRODERICK, C.J., dissented.

BRODERICK, C.J., dissenting. Because I believe that the statements the defendant made to Manchester police officers were not probative of his guilt, that evidence that he was interviewed by those officers was unfairly prejudicial, and that no limiting instruction could have prevented the jury from considering the presence of Manchester police officers for illegitimate purposes, I respectfully dissent.

The majority observes that "the defendant does not challenge the admission of his statements due to their hypothetical nature" and "does not challenge the admission of his statements because they implied his own thoughts about rape rather than thoughts that other people described to him." I disagree. The defendant has consistently challenged the admissibility of the statements he made to Manchester police officers under New Hampshire Rule of Evidence 403. That challenge necessarily involved a weighing of the statements' probative value against the danger of unfair prejudice. The starting point for assessing the probative value of those statements, or their relevance under New Hampshire Rule of Evidence 401, is a consideration of what those statements actually were and the context in which they were made. Thus, by raising a Rule 403 challenge, the defendant put at issue the hypothetical nature of his statements. Moreover, at several points in his brief, the defendant referred to the differences between the context of his interview (*i.e.*, elicitation of responses to hypothetical questions) and the context in which his interview answers were used at trial (*i.e.*, as evidence of his guilt of a specific sexual assault), which further demonstrates that he did challenge the admission of his statements due to their hypothetical nature. Similarly, by invoking Rule 403, the defendant put at issue the question of unfair prejudice, which, in my view, is sufficient to challenge the statements to Manchester

police as implying his own thoughts about rape rather than thoughts other people described to him.

The majority states that "[t]he statements made by the defendant show his consciousness of guilt because the methods for committing rape that he described are similar to the events of the alleged rape." However, as the State itself acknowledges: "It [the evidence in question] was merely the defendant's response to a hypothetical question, and as elicited, was *completely generic*. It simply conveyed the defendant's thoughts about what motivates a rapist and how a rapist operates." (Emphasis added.) In addition, the State also recites in its brief that the trial court indicated that the defendant's statements "were just general statements about how he feels rapists work." I agree that the defendant's statements are completely generic. They describe precautions that would pertain to virtually any rape, or any other crime against a person, and could have been offered by any reasonably intelligent person responding to the hypothetical questions posed to the defendant. That is, the answers the defendant gave did not require a rapist to give them, and certainly did not require the rapist charged in the Milford crime to give them. Had the defendant responded with specific details distinctive of the Milford rape, rather than generic precautions, *i.e.*, study the victim and cut off escape routes, then perhaps the responses might have demonstrated the defendant's consciousness of guilt. But the defendant's responses contained no such distinctive details. The responses the defendant gave to the hypothetical questions he was asked are no different than the answers a randomly selected person on the street might give when asked how to rob a bank. Such a person would likely suggest use of a gun, a disguise, a note for a teller, and a getaway car. Yet such a response would hardly be probative of whether that person ever committed a bank robbery, much less some specific bank robbery.

Moreover, the relationship the majority sees between the facts of the Milford rape and the defendant's hypothetical answers is not as strong as the majority implies. For example, on the subject of studying the victim, the defendant said a rapist would "look for them *for a day or so*, no longer than a day, so that he wouldn't be detected" (emphasis added), while the victim in the Milford rape described "how the defendant walked beside her and engaged in conversation with her *for a few minutes* before showing her a knife and beginning the assault" (emphasis added). In short, I see nothing in the content of the defendant's hypothetical answers that demonstrates his consciousness of guilt.

I also disagree with the majority's conclusion that "the defendant's demeanor demonstrated that he was speaking from personal experience [and that] [t]he intensity and thoughtfulness that the defendant exhibited by reclining in his chair and becoming flushed suggested the defendant's

personal experience with the offense charged." Consciousness of guilt may be evidenced by flight, *see, e.g.*, *State v. Littlefield*, 152 N.H. 331, 335 (2005), or by various kinds of statements, *see, e.g.*, *State v. Bean*, 153 N.H. 380, 387 (2006); *State v. Evans*, 150 N.H. 416, 420 (2003). We have not, however, held that a defendant's mere demeanor, body language or involuntary physical responses demonstrate consciousness of guilt. Nor would I be prepared to do so without first examining the possible need for expert testimony on this issue. Unlike the act of flight, or the content of a statement, the demeanor evidence on which the majority relies is, to my mind, ambiguous at best. Moreover, even if I were to accept the proposition that the defendant's intensity, thoughtfulness, posture, and facial reddening were evidence of personal experience, the majority does not explain how to distinguish between personal experience with rape in general, which was the topic of the questions the defendant was asked, and personal experience with the rape for which he was charged.

I am also troubled by the majority's analysis of the issue of unfair prejudice. According to the majority opinion:

> The trial court could reasonably have concluded that the presence of Manchester police in Milford would not imply to the jury that the defendant was suspected of additional assaults.
>
> . . . .
>
> The evidence of the Manchester officers' presence in Milford to question the defendant did not unambiguously convey prior criminal conduct to the jury. The evidence established, at most, a potential inference of other criminal conduct.

What the majority does not say, and what I do not know, is what the presence of the Manchester police in Milford, by invitation, could possibly imply to the jury other than something unfairly prejudicial about the defendant, that is, something about him unrelated to the charges in Milford. If we presume that the jury would have understood that Manchester police officers normally do not investigate crimes committed in Milford, then the jury had little choice but to conclude that these two Manchester police officers were interviewing the defendant on Manchester police business. Given the questions the Manchester officers asked, the most logical inference would be that they were investigating a Manchester rape. And why would they be questioning the defendant? The most logical inference would be that he was a suspect in a Manchester rape they were investigating. And if he were not a suspect, why would the Manchester officers ask the defendant questions about how a rapist thinks? The most logical inference would be that the Manchester officers considered the

defendant to be especially knowledgeable about rape. Given that the trial court excluded evidence concerning the source of the defendant's knowledge of rape—that he had learned some things about rape from rapists he had met in prison—the most logical inference would be that the source of the defendant's knowledge was personal experience as a rapist. As I look at the facts, the only reasonable inferences that the jury could draw from the presence of the Manchester officers in Milford are these: (1) the defendant was a suspect in a Manchester rape; or (2) the Manchester officers knew the defendant to be a rapist and sought him out for his special insights into the crime of rape. I can conceive of no inference that can reasonably be drawn from the presence of Manchester police officers in Milford that is not unfairly prejudicial to the defendant.

Finally, I disagree with the majority's conclusion that the trial court could have crafted a limiting instruction that would have prevented the jury from drawing an improper inference from the fact that the defendant was questioned in Milford by Manchester police officers. While the majority posits that such a limiting instruction could have been crafted, it does not suggest what such an instruction might say. The problem, it seems to me, with any such instruction, is that if members of the jury were to be instructed that they were not to infer that the defendant was a suspect in a crime being investigated by the Manchester police, then the only possible inference they would be allowed to draw is that the Manchester officers believed that the defendant had some kind of expert knowledge of rape that would help them solve a crime they were investigating. The defendant prefaced his comments with the explanation that the information he was providing came from rapists he met while in prison, and, at the defendant's request, the trial court correctly excluded any reference to the defendant's incarceration. Absent that information, any limiting instruction would lead the jury to the reasonable inference that the defendant knew a great deal about rape either because he was a rapist or because he spent time with rapists, discussing how to commit rapes. Either inference is devastating, and no other inference is reasonable. In other words, it is exceedingly difficult to imagine a limiting instruction that could have prevented the jury from drawing improper inferences from the fact that the defendant was questioned in Milford by Manchester police officers.

The majority also suggests that after the trial court excluded the introduction of evidence concerning the defendant's incarceration as the source of his knowledge of how rapists think, the defendant should have developed the foundation for his knowledge on cross-examination, and could have elicited testimony that he was conveying statements that he had heard from other people. There are three problems with this

suggestion. First, I am not sure that when evidence is introduced, it is the job of the opposing party to develop the foundation for the evidence offered against him. Second, if it were established that the evidence in question consisted of statements made to the defendant, how could such evidence possibly be relevant? That is, how does the fact that other people told the defendant how rapists think tend to make it more probable than it otherwise would have been that the defendant committed the charged rapes? And finally, if the defendant had conducted the suggested cross-examination, it could not have consisted of much more than this: "Q: What was the source of the defendant's responses to your hypothetical questions? A: Things he had been told by other people." No inquiry could have been conducted into who those other people might have been, to avoid the unfair prejudice that would have resulted from the defendant's admission that he had been incarcerated, thus leaving the jury to infer that the defendant was a person who voluntarily spent time with rapists, a conclusion the trial court well knew to be misleading if not flatly inaccurate.

What is most disturbing in this case is that the prosecution used the defendant's answers and his demeanor in answering hypothetical questions asked by Manchester police officers to allow the jury to draw inferences about his "consciousness of guilt" concerning the Milford rape. The jury appropriately was not told that the source of his knowledge, according to the defendant, was what he had heard from inmates who had been incarcerated with him. Accordingly, the jury would likely have concluded that the defendant was himself a rapist and knew what he described or postulated from his own experience. Any limiting instruction on this topic suggesting that what he reported he had "learned from others" would call into question the company the defendant kept and the purpose behind the conversation in which he learned about how rapists operate. Either way, the defendant would be unfairly prejudiced, either because of too much disclosure or too little.

Because I find the disputed evidence to have no probative value of consciousness of guilt, to be unfairly prejudicial, and to be incurable by any possible limiting instruction, I would reverse and remand for a new trial.

Accordingly, I respectfully dissent.