Merrimack
No. 2011-678

THE STATE OF NEW HAMPSHIRE

v.

ERNEST WILLIS

Argued: January 16, 2013
Opinion Issued: August 21, 2013

208

*Michael A. Delaney*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

CONBOY, J. The defendant, Ernest Willis, appeals his conviction, following a jury trial, on two counts of aggravated felonious sexual assault (AFSA) and one count of felonious sexual assault (FSA). *See* RSA 632-A:2 (2007); RSA 632-A:3, II (Supp. 2012). He alleges that the Superior Court (*Smukler*, J.) erred by admitting at trial statements he made to his church pastor, which he asserts violated his religious privilege, and by admitting certain portions of a recording of a police interview of him. Although his notice of appeal referenced his conviction by plea on a second charge of FSA, his brief did not assert any error as to his plea. We affirm all four convictions.

The jury could have found the following facts. In 1997, fifteen-year-old C.A. and the defendant, then thirty-nine years old, both attended the Trinity Baptist Church in Concord (the Church). C.A. became close to the defendant and his family through their active attendance at the Church, and babysat for them on occasion. When C.A. approached driving age, the defendant gave her driving lessons. During one of these lessons, the defendant and C.A. had sexual contact for the first time. About one month later, they had sexual intercourse at C.A.'s home.

On October 7, 1997, C.A., appearing "extremely upset," confided to a trusted neighbor (and a member of the Church) that she was pregnant. The Church's pastor, Charles Phelps, and C.A.'s mother were notified. Phelps and his wife, Linda, met with C.A. and her mother that night, and C.A. reported that the defendant was the father of the child. The next day,

Phelps met privately with the defendant, who acknowledged his relationship with C.A. Phelps reported this information to the police, after informing the defendant that he would do so, and reported it to the New Hampshire Division for Children, Youth and Families (DCYF) as well. Phelps and Linda met later that evening with the defendant and his wife.

For reasons disputed at trial, the police investigation stalled in 1997. It was reopened in 2010, when Detective Chris DeAngelis learned of the 1997 events and telephoned C.A. to investigate. He continued his investigation by speaking with Phelps, as well as the current pastor and Church members. In May 2010, he and Detective Sean Ford conducted an audio-recorded interview with the defendant.

The defendant was indicted on two sets of charges: one set included charges that intercourse had occurred in the defendant's car (car indictments); the other set included charges that intercourse had occurred in C.A.'s home (home indictments). The home indictments included an AFSA count alleging that he "overcame the victim through the actual application of physical force and/or superior physical strength." See RSA 632-A:2, I(a). Both sets of charges included an AFSA count alleging that C.A. "indicated by speech and/or conduct that she did not freely consent to the performance of the sexual act." See RSA 632-A:2, I(m). Both sets of charges also included an FSA count alleging statutory rape. See RSA 632-A:3, II. Prior to trial, the defendant pleaded guilty to the FSA count alleging statutory rape in the home.

To decide the remaining counts, the jury had to resolve two questions: (1) whether the sexual contact was consensual or forced; and (2) whether the contact involved only one instance of intercourse, as the defendant claimed, or two, as the State claimed. The evidence included the audio-recorded police interview of the defendant, partially redacted at the defendant's request, and Phelps's testimony.

## I. Religious Privilege

The defendant first argues that the court erred by denying his motion to preclude the testimony of his pastor, Phelps, about two conversations. One conversation was solely between the defendant and Phelps, during which the defendant told Phelps that he had been sexually involved with C.A. on two occasions (the "twice" statement). The other conversation included the defendant's wife and Phelps's wife, during which the defendant described his role in his relationship with C.A. as that of the "aggressor" (the "aggressor" statement). Before trial, following argument and voir dire of Phelps, the trial court ruled that the religious privilege under New Hampshire Rule of Evidence 505 did not protect either statement and denied the defendant's motion in limine to exclude them.

Following the defendant's conviction, the trial court issued a written order explaining its denial of the defendant's motion *in limine*. The trial court found that the religious privilege did not apply because "the statements were neither 'confessions' nor made to Pastor Phelps in his 'professional character.' " As to the "aggressor" statement, the court found no privilege because it occurred in the presence of third parties. As to the "twice" statement, the trial court found no privilege because Phelps had initiated the conversation for the purpose of investigating "whether or not members of the church had broken any church rules." The court further found that, even if the statements had initially been privileged, the defendant waived the privilege during a subsequent interview with the police. *See* N.H. R. Ev. 510. Finally, the trial court observed that the religious privilege is a qualified one under New Hampshire Rule of Evidence 505, which may yield to countervailing considerations, such as that reflected by the disclosure requirement under the Child Protection Act. *See* RSA 169-C:29, :32 (2002). The court noted, however, that it "need not decide this issue."

Generally, ascertaining the existence of a privilege, including the religious privilege, rests within the sound discretion of the trial court. N.H. R. Ev. 104(a); *see State v. Pelletier*, 149 N.H. 243, 247 (2003) (marital privilege); *State v. Gordon*, 141 N.H. 703, 705 (1997) (attorney-client privilege). We generally review such rulings for an unsustainable exercise of discretion, *Desclos v. S. N.H. Med. Ctr.*, 153 N.H. 607, 610 (2006), and defer to the trial court's factual findings as long as they are supported by the evidence and are not erroneous as a matter of law. *Franklin v. Callum*, 146 N.H. 779, 781 (2001). However, we review questions of law — including the interpretation of a statute or rule of evidence — *de novo*. *Lillie-Putz Trust v. Downeast Energy Corp.*, 160 N.H. 716, 721-22 (2010).

Our religious privilege is codified by statute and set forth in New Hampshire Rule of Evidence 505. The statute provides: "A priest, rabbi or ordained or licensed minister of any church or a duly accredited Christian Science practitioner shall not be required to disclose a confession or confidence made to him in his professional character as spiritual adviser, unless the person confessing or confiding waives the privilege." RSA 516:35 (2007). The language of Rule 505 is essentially the same.

█ Because the religious privilege did not exist at common law, the protections conferred by the privilege are therefore based upon the statute and the rule of evidence adopting it. *See* Mitchell, *Must Clergy Tell? Child Abuse Reporting Requirements Versus the Clergy Privilege and Free Exercise of Religion*, 71 MINN. L. REV. 723, 737 (1987) ("clergy privilege was not part of the common law . . . most American courts and commen-

tators have announced that the privilege, if it exists, must rest on statute"); *see also, e.g., Seidman v. Fishburne-Hudgins Educ. Foundation, Inc.*, 724 F.2d 413, 415 (4th Cir. 1984).

■ "It is well settled that statutory privileges should be strictly construed." *State v. Melvin*, 132 N.H. 308, 310 (1989). When interpreting a rule of evidence, as with a statute, we will first look to the plain meaning of the words. *State v. Holmes*, 159 N.H. 173, 175 (2009). We are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *DaimlerChrysler Corp. v. Victoria*, 153 N.H. 664, 666 (2006).

### A. "Aggressor" statement

We first consider whether the privilege applied to the "aggressor" statement. Relying upon *Melvin*, the trial court found that it did not because the statement was made in the presence of the defendant's wife and Phelps's wife. *Melvin*, 132 N.H. at 310. We agree that the privilege did not apply because of the presence of Phelps's wife, whom the trial court found to be an " 'extraneous' third party."

■ In *Melvin*, we noted that "[g]enerally, the presence of an 'extraneous' third party during a privileged conversation operates to destroy the privilege." *Melvin*, 132 N.H. at 310; *see also, e.g., State v. West*, 345 S.E.2d 186, 189 (N.C. 1986) (communication made in presence of minister's wife not confidential). We rejected the defendant's argument that the presence of the clergyman's wife did not invalidate the privilege because the privilege applied to communications made in the presence of an assistant to the clergyperson. *Melvin*, 132 N.H. at 309-10. We contrasted our religious privilege, which does not protect communications to clergy assistants, with the privileges granted by New Hampshire Rules of Evidence 502 and 503, which provide that the privileges applicable to communications to an attorney, physician, psychologist, or certified pastoral counselor are also applicable to communications to persons assisting or working under the supervision of the attorney, physician, psychologist or certified pastoral counselor. *See Melvin*, 132 N.H. at 310; N.H. R. Ev. 502, 503. We noted that "[t]he absence of such a provision in the express language of the religious privilege of Rule 505 thus becomes even more conspicuous," *Melvin*, 132 N.H. at 310, and that "[i]f this court in approving the rules had intended the coverage of the religious privilege to be as broad as that of the physician-patient and the attorney-client privileges, it could easily have provided for the presence of third party 'assistants' within the express language of Rule 505." *Id.* The defendant does not contend that Phelps was a certified pastoral counselor.

■ We are not persuaded by the defendant's attempt to distinguish *Melvin* on the grounds that Phelps's wife allegedly played a role in any spiritual counseling given by Phelps. The defendant relies upon *State v. Martin*, 975 P.2d 1020 (Wash. 1999), and *In re Grand Jury Investigation*, 918 F.2d 374 (3d Cir. 1990). In *Martin*, the court held that "the presence of a third person may vitiate the privilege unless that person is another member of the clergy or the person's presence is necessary for the communication." *Martin*, 975 P.2d at 1029. In *In re Grand Jury Investigation*, the court analogized the religious privilege to the attorney-client privilege and held that "the presence of third parties, if essential to and in furtherance of the communication, does not vitiate the clergy-communicant privilege." *In re Grand Jury Investigation*, 918 F.2d at 377. Even if we were to adopt the reasoning of these cases, however, the defendant has not cited any facts that demonstrate that Phelps's wife's presence was "necessary for the communication" or "essential to and in furtherance of the communication." We conclude that the trial court did not err in admitting the "aggressor" statement because it was not made in confidence. We therefore need not address the trial court's additional reasons for admitting the "aggressor" statement.

### B. "Twice" statement

We next consider the admission of the "twice" statement, which the defendant made to Phelps alone. The trial court found that the religious privilege did not apply because the statement was "neither [a] 'confession[ ]' nor made to Pastor Phelps in his 'professional character.' " The trial court further found that, in any event, the defendant waived any privilege.

■ We first note that the defendant does not appear to contest the trial court's finding that the defendant's statement was not a "confession." The defendant instead cites the Note of the Advisory Committee that drafted a similarly worded proposed Federal Rule of Evidence, which provides that

> [t]he choice between a privilege narrowly restricted to doctrinally required confessions and a privilege broadly applicable to all confidential communications with a clergyman in his professional character as spiritual adviser has been exercised in favor of the latter.

*See* Advisory Committee's Note to Proposed FED. R. EV. 506, 56 F.R.D. 183, 248 (1973). We agree: RSA 516:35 and Rule 505 explicitly protect both confessions and "confidence[s]" made to clergy in their professional character. We therefore understand the defendant's argument to be that, in accordance with the trial court's findings, the statement was a protected confidence, and not a "confession."

██ The purpose of the religious privilege, as articulated by the United States Supreme Court, is the recognition of "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *Trammel v. United States*, 445 U.S. 40, 51 (1980); *see also Keenan v. Gigante*, 390 N.E.2d 1151, 1154 (N.Y. 1979) (noting that ordinarily, "statutes bestowing an evidentiary privilege should be construed in furtherance of their policy to encourage uninhibited communication between persons standing in a relation of confidence and trust" (quotation omitted)). Thus, "the cleric-penitent privilege applies when, under the totality of the circumstances, an objectively reasonable penitent would believe that a communication was secret, that is, made in confidence to a cleric in the cleric's professional character or role as a spiritual advisor." *State v. J.G.*, 990 A.2d 1122, 1124 (N.J. 2010); *see also In re Grand Jury Investigation*, 918 F.2d at 377 ("this privilege protects communications to a member of the clergy, in his or her spiritual or professional capacity, by persons who seek spiritual counseling and who reasonably expect that their words will be kept in confidence"); *Nicholson v. Wittig*, 832 S.W.2d 681, 685 (Tex. App. 1992) ("[T]he privilege attaches when a person makes a communication *with a reasonable expectation* of confidentiality to a member of the clergy acting in his or her professional or spiritual capacity." (emphasis added)). *But see Magar v. State*, 826 S.W.2d 221, 223 (Ark. 1992) (heavily weighing clergyperson's subjective belief as to purpose of conversation in analyzing applicability of religious privilege). We conclude, based upon this precedent and the wording of our statute, that whether a communication is a "confidence" within the meaning of the religious privilege depends upon the objectively reasonable expectations of the communicant, under the totality of the circumstances.

██ Just as all fifty states have enacted statutes recognizing a religious privilege, so too has each state passed a statute requiring mandatory reporting of child abuse. 2 D. GREENWALD ET AL., TESTIMONIAL PRIVILEGES § 6:14, at 6-50 to 6-51 (Trial Practice Series, 3d ed. 2005 & Supp. 2010). As one commentator has noted, however, New Hampshire is one of only six states to specifically abrogate the clergy communications privilege in its child abuse reporting statute, requiring a clergyperson to report child abuse regardless of the possible application of the religious privilege. GREENWALD, *supra* § 6:14, at 6-52. Specifically, our Child Protection Act mandates: "Any . . . priest, minister, or rabbi . . . having reason to suspect that a child has been abused . . . shall report the same in accordance with this chapter." RSA 169-C:29. The required report

*shall*, if known, contain . . . the specific information indicating neglect or the nature and extent of the child's injuries (including any evidence of previous injuries), the identity of the person or persons suspected of being responsible for such neglect or abuse, and *any other information that might be helpful* in establishing neglect or abuse or that may be required by the department.

RSA 169-C:30 (2002) (emphasis added). The Act further provides: "The privileged quality of communication between husband and wife and any professional person and his patient or client, except that between attorney and client, shall not apply to proceedings instituted pursuant to this chapter and shall not constitute grounds for failure to report as required by this chapter." RSA 169-C:32. Because our law provides that any statement to a clergyperson that might be helpful in establishing child abuse is not protected by the privilege, a communicant cannot have an objectively reasonable expectation that such a statement will remain confidential. "It is elementary, as well as indispensable to the orderly administration of justice, that every man is presumed to know the laws of the country in which he dwells." *State v. Stratton*, 132 N.H. 451, 457 (1989) (quotation omitted).

 Because the defendant's statement indicating child abuse cannot be a "confidence" to which the religious privilege applies, the trial court did not err in admitting the "twice" statement. Having reached this conclusion, we need not address the question of whether the statement was made to Phelps in his professional character as spiritual adviser, or the question of whether the defendant waived any privilege. Neither need we decide whether, under our statute and rule, a clergyperson is a holder of the privilege who may assert or waive it.

## II. Police Interview

Before trial, the defense moved *in limine* to preclude introduction of the May 2010 audio-recorded police interview of the defendant, arguing that it contained both hearsay and the opinions of the interrogating officers as to the credibility or truthfulness of the defendant and of C.A. Following a hearing and supplemental briefing from both parties, the trial court redacted portions of the recording containing statements of the interrogating officers that "were uttered as an opinion on credibility without a contextual purpose or without the result of eliciting a relevant response from the defendant." It otherwise denied the defendant's motion. Further redaction took place by mutual agreement. After the State played the redacted recording at trial, the court gave a limiting instruction at the

defendant's request, informing the jury that "the question part of the tape that you have just heard is only being admitted for the purpose of . . . context, what elicited a particular response of the Defendant," and not for the truth of any assertions contained within the officers' questions.

The defendant argues that several statements should have been excluded under New Hampshire Rule of Evidence 403 because their probative value was substantially outweighed by the danger of unfair prejudice. The challenged statements fall into two categories: statements in which the interrogating officers expressed their view that C.A. had no motive to lie, thus allegedly implying that she was not lying; and statements in which the officers described a 1997 DCYF report, purportedly based upon information provided by an anonymous confidante of C.A., in which the confidante described the sexual contact between the defendant and C.A. as forcible.

 Under Rule 403, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." *State v. Nightingale*, 160 N.H. 569, 574 (2010). Unfair prejudice is not, of course, mere detriment to a defendant from the tendency of the evidence to prove guilt, in which sense all evidence offered by the prosecution is meant to be prejudicial. *Id.* "Rather, the prejudice required to predicate reversible error is an undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged." *Id.*

> Among the factors we consider in weighing the evidence are: (1) whether the evidence would have a great emotional impact upon a jury; (2) its potential for appealing to a juror's sense of resentment or outrage; and (3) the extent to which the issue upon which it is offered is established by other evidence, stipulation or inference.

*Id.* at 574-75. "The trial court is in the best position to gauge the prejudicial impact of particular testimony, and what steps, if any, are necessary to remedy that prejudice." *Id.* at 575 (quotation omitted). Thus, we give the trial court broad latitude when ruling on the admissibility of potentially unfairly prejudicial evidence, and we will not disturb the trial court's decision absent an unsustainable exercise of discretion. *See id.* "To show that the trial court exercised unsustainable discretion, the defendant must

show that the ruling was clearly untenable or unreasonable to the prejudice of his case." *State v. Jordan*, 148 N.H. 115, 117 (2002).

*A. "Motive to lie" statements*

 We first consider the interrogating officers' statements during the interview concerning C.A.'s motive to lie. We note that, in the trial context, we have adopted a "broad prohibition on questions requiring a witness to comment upon the credibility of other witnesses." *State v. Lopez*, 156 N.H. 416, 424 (2007) (rejecting a case-by-case approach in favor of a broad prohibition). "We reasoned that such questioning interferes with the jury's obligation to determine the credibility of witnesses, and is not probative in that it requires a witness to testify to things outside of her or his knowledge." *State v. Parker*, 160 N.H. 203, 213 (2010) (quotation omitted). We have not previously addressed the admissibility of police officers' statements during an interrogation bearing on witness credibility. Several other jurisdictions, however, have examined the issue or a variant thereof. *See, e.g., Dubria v. Smith*, 224 F.3d 995, 1000-03 (9th Cir. 2000) (en banc); *State v. Boggs*, 185 P.3d 111, 119-21 (Ariz. 2008) (en banc); *People v. Lopez*, 129 P.3d 1061, 1065-67 (Colo. App. 2005); *State v. Cordova*, 51 P.3d 449, 453-57 (Idaho Ct. App. 2002); *State v. Elnicki*, 105 P.3d 1222, 1225-30 (Kan. 2005); *Lanham v. Com.*, 171 S.W.3d 14, 23-28 (Ky. 2005); *State v. O'Brien*, 857 S.W.2d 212, 221-22 (Mo. 1993) (en banc); *Com. v. Kitchen*, 730 A.2d 513, 521-22 (Pa. Super. Ct. 1999); *State v. Demery*, 30 P.3d 1278, 1281-85 (Wash. 2001) (en banc); *State v. Curtiss*, 250 P.3d 496, 508 (Wash. Ct. App. 2011); *State v. Sweet*, 234 P.3d 1193, 1202-06 (Wyo. 2010).

 It is not clear to what extent there exists a majority view on the issue of the admissibility at trial of statements, previously recorded during police interrogation, relating to witness credibility. *Compare Lanham*, 171 S.W.3d at 26-27 (stating, "[t]hough various courts across the country have addressed this issue, it is quite difficult to synthesize a majority rule, especially given that the evidentiary rules in these various states differ significantly," but noting that "even the courts that have recognized introduction of this type of evidence as error have been hesitant to consider such introduction alone to be reversible error"), *with State v. Castaneda*, 715 S.E.2d 290, 294 (N.C. Ct. App 2011) ("The majority of appellate courts of other jurisdictions that have considered such statements have held them admissible based on the rationale that such 'accusations' by interrogators are an interrogation technique and are not made for the purpose of giving opinion testimony at trial."). Although these courts have not reached consensus, we agree with the defendant that three principles emerge from the cases: (1) an officer's statements communicating information or belief are not admissible to prove the truth of the matters stated; (2) there is a

risk that a jury may use the officer's factual assertions for an improper, substantive purpose, which risk may be reduced by a limiting instruction from the court; and (3) in some circumstances, the officer's statements provide necessary context without which the jury cannot appreciate the meaning of the suspect's answers, *see, e.g., Cordova,* 51 P.3d at 455. Further, "[a]lmost all of the courts that have considered the issue recognize that this form of questioning is a legitimate, effective interrogation tool. And because such comments are such an integral part of the interrogation, several courts have noted that they provide a necessary context for the defendant's responses." *Lanham,* 171 S.W.3d at 27; *see also State v. Cassavaugh,* 161 N.H. 90, 102-03 (2010) (finding police interview highly probative where "defendant's demeanor visibly changed when the conversation turned to the murders" and defendant made a possibly false exculpatory statement).

■ We agree with the courts that have found that "there is a difference between an investigating officer giving an opinion as testimony before a jury, and an investigating officer giving an opinion during the interrogation of a suspect." *Odeh v. State,* 82 So. 3d 915, 920 (Fla. Dist. Ct. App. 2011), *review denied,* 81 So. 3d 415 (Fla. 2012); *see also, e.g., State v. Zakaria,* 730 N.W.2d 140, 147-48 (S.D. 2007). We recognize that some courts have disagreed and excluded interrogation statements, reasoning that they implicated the same concerns as a witness's trial testimony regarding the credibility of the defendant or another witness. *See Elnicki,* 105 P.3d at 1229 (holding that officer's statements in videotaped interrogation are inadmissible opinion evidence and noting that "context" for defendant's shifting stories could be shown in other ways); *Kitchen,* 730 A.2d at 521 (analogizing interviewer's statements regarding defendant's truthfulness to a prosecutor's inadmissible personal opinion as to defendant's guilt); *State v. Jones,* 68 P.3d 1153, 1155 (Wash. Ct. App. 2003) ("We find no meaningful difference between allowing an officer to testify directly that he does not believe the defendant and allowing the officer to testify that he told the defendant during questioning that he did not believe him."). We are persuaded, however, that "[b]y making such comments, the officer is not trying to convince anyone — not the defendant (who knows whether he or she is telling the truth), other officers, a prosecutor, or the jury — that the defendant was lying," *Lanham,* 171 S.W.3d at 27, but, rather, is engaging in "an interrogation technique aimed at showing the defendant that the officer recognizes the holes and contradictions in the defendant's story, thus urging him or her to tell the truth." *Id.* Thus, we conclude that a recorded interview does not implicate the same concerns that underlie our prohibition against witness testimony at trial that opines upon the credibility of

other witnesses. *Cf. Lopez*, 156 N.H. at 424. Nevertheless, we recognize that certain tactics, which may be permissible for purposes of interrogating a defendant, are not necessarily also admissible at trial for consideration by the jury. *See Cordova*, 51 P.3d at 455-56.

We first consider the probative value of the officers' statements and questions about C.A.'s motive to lie. The trial court allowed the jury to hear the following exchanges:

> Q: [DeAngelis]: Ok, why would she lie?
>
> A: I don't know. To get herself off the hook so wouldn't claim responsibility for any of this.
>
> Q: For, for what?
>
> . . . .
>
> Q: I'm not, I guess you don't, do you understand I don't see the motivation for her to lie.
>
> A: Well, as I stated earlier, I think it's to pass the, any of the responsibility of what would be due to her off of her, onto me.
>
> Q: I could, I could see that. I could see that if she was fifteen, she's now an adult.
>
> A: And then now, like I say it's been twelve years but as you say the memory once you think about something for a time will probably become clearer. So then you would be able to associate the events and be able to think clearly about what transpired. So and obviously she in order to continue with her story line, use the same story now that was used at that time.
>
> Q: Ok.
>
> A: Which is inaccurate and incorrect.
>
> Q: Why, well, when I called her up out of the blue, when I located her and, and talked to her about this, what is her motivation, what stops her from just saying, no, you know, that was, that was a consensual relationship I got involved in.
>
> A: OK, that's bringing responsibility back onto herself.
>
> Q: Well, what's, what's going to happen to her though?
>
> A: She might not know either.

At the time of these exchanges, the officers had already told the defendant that they had conflicting information, that the truth was "somewhere in the middle," and that they wanted to hear both sides of the story so they could "make the right assessment." During these exchanges, DeAngelis asked the defendant to explain why C.A. would be motivated to be untruthful

about their relationship. His statements and questions also challenged the defendant's explanations in order to prompt the defendant to expand on, or retract, his explanations; they did not express the officer's opinion of C.A.'s credibility. DeAngelis's questions and statements are, therefore, probative as context for the defendant's explanations of C.A.'s actions and her alleged bias.

■ Next, we consider whether the danger of unfair prejudice to the defendant from admission of this evidence substantially outweighed its probative value. See Nightingale, 160 N.H. at 575. The risk of undue prejudice from such "reason to lie" questions is minimal: unlike an improper appeal to emotion, the inquiry into a witness's bias provides important and legitimate information for the fact finder to consider. See, e.g., United States v. Akitoye, 923 F.2d 221, 223-25 (1st Cir. 1991) ("Unlike a 'was-the-witness-lying' question," the question, " 'Do you know of any reason why [the witness] would lie about you?' " "could appropriately have been allowed," because "such an inquiry does not call for an opinion, but for articulable facts" and witness bias is a legitimate ground for inquiry). Even Kitchen, a landmark case for the view that a jury should not hear an officer's "vouching" statements during a recorded interrogation, distinguishes between officers' inadmissible statements on credibility and questions as to motive that invite an answer. Kitchen, 730 A.2d at 522. We agree with the trial court's implicit finding that the officers' questions and statements to the defendant regarding C.A.'s credibility do not carry an "undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged." Nightingale, 160 N.H. at 574.

Because the defendant has not established that the probative value of the challenged statements was "substantially outweighed by the danger of unfair prejudice," N.H. R. Ev. 403, he has not demonstrated that the trial court's admission of these exchanges was an unsustainable exercise of discretion.

### B. Anonymous DCYF report

We next consider the probative value of the other challenged portions of the defendant's recorded interview, concerning the anonymously filed 1997 DCYF report. The defendant objects to the admission of two portions:

> Q. (DEANGELIS) Ok. This is probably going to make it clear why, why we're having this conversation, why this is, you're having this conversation again or basically why this is being revisited again. There was two reports to DCYF back in '97. This is a second report. It's much longer. It does not come from the Pastor.

And it alleges a different version of events of how the intercourse between you and [C.A.] happened. It alleges, and this is where it's important, I think, to make sure that we're all talking about the truth here, ok? This alleges physical force by you on [C.A.]. OK? She's alleging a rape not, not a statutory because people are not old enough, do you know what I'm saying? She's not old enough to consent. That's a statutory rape. This would be a forcible rape. And that is one of the main reasons why we have to, why we reached out to you because we have conflicting information. Ok? She is alleging that you, that there were two incidents. That you gave her driving lessons and on one of those occasions, you forced yourself upon her. You pulled her in the back seat and you had sex with her, by force, ok? The second incident happened at her mother's apartment. You came over, she says she let[ ] you in. You lock the door and you pushed her onto the couch. And you had sex with her against her will. Ok? That's what this report alleges. . . .

Later in the interview, the following exchange occurred:

A: [the defendant]: But there was something produced in 1997?

Q: Yes, but it's not from her. It's from DCYF.

A: Ok, who (unintelligible) to DCYF?

Q: (FORD) The pastor.

Q: (DEANGELIS) The pastor on one, the second one is an anonymous party who indicates in her report that she's, by her indication and her report of who she is without giving her name, it's not [C.A.]. Ok? They got this information from somebody who [C.A.] talked to back then.

A: Right.

Q: Ok? Could be a family member. Could be a friend. Could be a neighbor.

A: So she's recalling what she gave for information back then?

Q: No, she's, she didn't have access to that, that DCYF report.

A: But she provided this information . . . .

Q: But gave me an independent report.

A: . . . to somebody?

Q: She's talked to people back then.

A: Right.

Q: She confided in people back in '97.

Other than these passages in the recording, the jury at trial heard nothing about the content of the anonymously filed DCYF report.

The defendant argues that the officers' statements lack probative value because the reference to a 1997 DCYF report was not necessary for the jury to understand the nature of the alleged conduct — forcible rape — that the defendant denied. He argues that his denial related to C.A.'s allegations, rather than to any DCYF report, so statements about the DCYF report added little probative value to counter their significant prejudice. As to the second excerpt, the defendant also argues that it lacks probative value because the defendant's statements "reflect only [his] developing comprehension of the claimed existence of such a report," and do not respond to the allegations themselves or reveal anything useful about the defendant's consciousness of guilt.

The prejudice the defendant alleges stems from the report's significance in resolving a dispute at the heart of the defense's case — that of C.A.'s credibility. The defendant argued that C.A. did not act in 1997 consistently with having been forcibly raped, as she testified at trial. One of the behaviors the defense argued was inconsistent with forcible rape was C.A.'s failure to disclose to anyone in 1997. According to the defendant, the DCYF report referred to by DeAngelis, purporting to establish that C.A. had indeed disclosed two incidents of forcible rape, consistent with her trial testimony, significantly bolstered C.A.'s credibility to his prejudice. Such prejudice was compounded, the defendant urges, by the fact that "the jury could have little doubt that the second report existed; DeAngelis's words implied that a copy of it was present in the interrogation room," and that the existence of such a report was the very reason the case had been reopened and the defendant reinterviewed. Citing *State v. Yates*, 152 N.H. 245 (2005), the defendant further argues that the limiting instruction was inadequate to purge the statements of their prejudicial effect.

The State responds that the statements about the DCYF report provided context for the defendant's shifting accounts and lack of candor, which were probative of his consciousness of guilt. The State argues that rather than reflecting a "developing comprehension of the claimed existence of such a report," the defendant's responses show "that he was trying to figure out who C.A. had talked to in 1997, who had started talking about the incidents in 2010, and what that person had told the police about the incidents." The State points out that after learning of the anonymous DCYF report, the defendant asked whether the case had been reopened because someone had come forward and when, whether that person was a church member, whether that person was a good Samaritan, what the status of the case had been prior to that disclosure, and who had made the 1997 report to DCYF. The State characterizes the defendant's statements and questions as "trying to determine how much the police knew," and, therefore, probative of his guilt.

Although the State argues in the alternative that C.A.'s statements contained in the DCYF report were substantively admissible pursuant to New Hampshire Rule of Evidence 801(d)(1)(B) and the specific contradiction doctrine, we decline to address this argument because the State did not raise it before the trial court. *See State v. McLaughlin*, 135 N.H. 669, 672 (1992).

■■■ We agree with the State that the defendant's "inconsistent and evasive answers" constitute at least some "evidence of the defendant's consciousness of guilt." *State v. Bean*, 153 N.H. 380, 387 (2006). Thus, because DeAngelis's statements about the anonymous DCYF report provide context for these statements by the defendant, they have probative value. *See Lanham*, 171 S.W.3d at 27 ("We agree that such recorded statements by the police during an interrogation are a legitimate, even ordinary, interrogation technique, especially when a suspect's story shifts and changes. We also agree that retaining such comments in the version of the interrogation recording played for the jury is necessary to provide a context for the answers given by the suspect."); *see also Dubria*, 224 F.3d at 1001-02; *Lopez*, 129 P.3d at 1066; *O'Brien*, 857 S.W.2d at 221-22.

We next consider whether the danger of unfair prejudice to the defendant from the limited admission of this evidence substantially outweighed its probative value. *See Nightingale*, 160 N.H. at 575. The distinctions between this case and the Ninth Circuit's analysis in *Dubria* illustrate the potentially prejudicial effect of submitting the statements about the DCYF report to the jury. *See Dubria*, 224 F.3d 995. In *Dubria*, the "tape and transcript show[ed] what the state appellate courts quite properly described as an 'unremarkable interview' . . . . There was nothing in [the detective's] statements that suggested evidence or theories of the case that were not presented at trial." *Id.* at 1001. The Ninth Circuit went on to note that, although the "testimony of law enforcement officers often carries an aura of special reliability and trustworthiness," the detective's "statements were questions in a pre-trial interview that gave context to [the defendant's] answers. *They were not the types of statements that carry any special aura of reliability,*" and they therefore did not affect the fundamental fairness of the trial. *Id.* at 1001-02 (quotation omitted; emphasis added). Here, DeAngelis's statements referring to the DCYF report did "suggest[ ] evidence . . . not presented at trial." *Dubria*, 224 F.3d at 1001. Our case is thus more akin to *Cordova. See Cordova*, 51 P.3d 449, 455. In that case, the Court of Appeals of Idaho held admissible officers' interrogation statements accusing the defendant of lying. *Id.* at 455. However, the court distinguished these interrogation techniques from the officers' statements that one of the officers was an "expert in deception detection." *Id.*

The court concluded that these statements lent the officer an aura of special reliability and that they were not necessary to give context to Cordova's answers, and, therefore, they should have been redacted rather than shown to the jury. *Id.*

We agree with the defendant that allowing the jury to hear the officers' statements about the anonymous DCYF report posed a danger of unfair prejudice. The ostensibly official report to which DeAngelis referred was not admitted at trial and was the reason DeAngelis gave the defendant for "why we're having this conversation . . . or basically why this is being revisited again." Thus, although DeAngelis's statements were not admitted for their truth, the statements specifically referring to the report, which was apparently in the interview room with the officers, carried a significant potential that the jury would understand them as evidence bolstering C.A.'s credibility. The statements therefore posed a substantial danger of unfair prejudice, and should not have been admitted.

However, we find significant the *Dubria* court's ruling that "even if it was error to admit the tapes and transcripts without redacting [the detective's] statements, any error was cured by the judge's two cautionary instructions." *Id.* at 1002; *cf. Cordova*, 51 P.3d at 456 ("[h]aving concluded that the second officer's comments that he is an expert in deception detection were improperly admitted and that it was error for the district court to admit other officer comments without a limiting instruction," court nonetheless found admission of those comments amounted to harmless error); *Lopez*, 129 P.3d at 1066 (recognizing the potential for jury confusion and advising courts that minimizing "the subject of victim credibility and using a limiting instruction of a type suggested in *Dubria* . . . would alleviate any concern for potential unfair prejudice").

■ Here, after the jury heard the redacted recording, the trial court gave the following instruction:

> In this interview, as in many interviews, in fact, as in the interrogation in the courtroom, there are questions. There are answers. You can consider the answers of the Defendant for whatever evidentiary value you want to use them for. In terms of the questions, there were statements made about what other people said. There were statements made about what the person asking the questions thought or believed. There were questions. There were all kinds of statements in those questions.
>
> And you are not to take those statements for the truth. There is no — we're not to take it for anything other than, it was a decision of the questioner to ask a question in a particular way to elicit a response from the Defendant. Whether the information in

the question was accurate or not accurate, there's no way — you're not to take it for that and it's not being admitted for that.

So it's only — the question part of the tape that you have just heard is only being admitted for the purpose of you hearing the context, what elicited a particular response of the Defendant.

Further, in granting the jury's request to listen to the recording of the interview during deliberations, the trial court gave the following limiting instruction:

I remind you when you heard it in the courtroom I gave a limiting instruction. I just want to remind you of that limiting instruction at this time. You can take the questions solely for the purpose of being — of eliciting a response from the Defendant, but not for the truth; may or may not be true, but not for the truth of anything that's said in those questions, simply that they were a means by which the interviewer was seeking to elicit a response. You — in terms of the responses, of course, you can use them for any purpose you wish.

The court's instructions properly informed the jurors that they could not consider the officers' statements for their truth. These statements included any assertions about the anonymous DCYF report that was not admitted at trial. "Juries are presumed to follow instructions." *Yates*, 152 N.H. at 252; *see also Dubria*, 224 F.3d at 1002 ("Ordinarily, a cautionary instruction is presumed to have cured prejudicial impact."); *Curtiss*, 250 P.3d at 508 ("Absent evidence that the jury was unfairly influenced, we presume that the jury followed the court's instructions."). Thus, although the statements about the DCYF report should not have been admitted, we conclude that the error was cured by the court's prompt and thorough instructions.

We are not persuaded by the defendant's argument pursuant to *Yates*. He appears to argue that the jury instruction could not have cured the prejudice because to follow the instruction would have required the jury to disregard information "crucial to the resolution of the case." In *Yates*, we found that the trial court erred in allowing a jury to hear evidence that possessed minimal probative value and created potentially unfair prejudice to the defendant. *Yates*, 152 N.H. at 252-53. We found that two limiting instructions were inadequate to cure the prejudice because a jury that followed the instructions would find "nothing left on the tape for it to consider" except for cumulative evidence. *Id.* at 252. Here, in contrast, the redacted recording contained a wealth of evidence in the form of the defendant's statements and behavior that were not cumulative of other evidence and that were not unfairly prejudicial. Unlike in *Yates*, where the

jury was told to disregard nearly all of the recorded material presented at trial, *see id.*, here, "the jury had to simply do what it is asked to do all the time — consider the questions posed by Detective [DeAngelis] as mere questions and not as evidence." *Dubria*, 224 F.3d at 1002. Given the probative value of the officers' questions and statements and the prompt and thorough limiting instructions given by the court, reversal is not warranted. *See, e.g., id.*; *see also Nightingale*, 160 N.H. at 574-75 (standard for reversal based upon undue prejudice).

*Affirmed.*

DALIANIS, C.J., and HICKS, LYNN and BASSETT, JJ., concurred.