NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Strafford
No. 2021-0093

THE STATE OF NEW HAMPSHIRE

v.

TIMOTHY R. VERRILL

Argued: April 21, 2022
Opinion Issued: September 14, 2022

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Peter Hinckley, senior assistant attorney general, on the brief and orally), for the State.

David M. Rothstein, director of litigation, New Hampshire public defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. In this interlocutory appeal, the defendant, Timothy R. Verrill, appeals an order of the Superior Court (Howard, J.) denying his motion to dismiss his pending indictments with prejudice after his unopposed motion for a mistrial had been granted. See Sup. Ct. R. 8. On appeal, he contends that the Double Jeopardy and Due Process Clauses of the State and Federal

Constitutions prohibit his retrial because of the State's discovery violations. See N.H. CONST. pt. I, arts. 15, 16; U.S. CONST. amends. V, XIV. We affirm in part, vacate in part, and remand.

I. Facts

A. First Motion to Dismiss

The following facts either were found by the trial court or relate the content of documents in the appellate record. A grand jury indicted the defendant on two counts of first degree murder, two counts of second degree murder, and five counts of falsifying evidence. The indictments concern the deaths of Christine Sullivan and Jenna Pelligrini, whose bodies were found on January 27, 2017, at the home of Dean Smoronk. Sullivan lived with Smoronk and Pelligrini was a houseguest. The investigations of the homicides involved numerous witnesses who either were present at the house around the time of the murders or were believed to have been involved in a drug operation headed by Smoronk and Sullivan. The defendant was alleged to have worked for Smoronk and Sullivan in that operation. He was indicted for the murders and related charges in November 2017.

The defendant's jury trial began in Superior Court (Houran, J.) in October 2019. On October 23, 2019, in the middle of the trial and during the State's case-in-chief, defense counsel informed the court that the State had not disclosed two emails sent to the New Hampshire State Police Major Crimes Unit (MCU) by a friend of a witness. After defense counsel submitted the emails for review by the court and the prosecution, the prosecutors informed the court and defense counsel that they had no prior knowledge of the emails and that the State trooper to whom the emails had been sent was expected to be at the courthouse soon to answer any questions about the undisclosed materials.

At the end of the trial day, outside the jury's presence, the prosecutors informed the court and defense counsel that they had asked the trooper to download all of the information he had about this case, which resulted in the trooper producing numerous documents, including recorded witness interviews, of which the prosecutors had been unaware. The prosecution represented that some of the recorded interviews duplicated materials already disclosed to the defense. Defense counsel was granted time to review the materials.

The following day, October 24, the defendant moved to dismiss the indictments with prejudice based on the State's failure to disclose the discovery before trial. The trial court suspended the trial to hold a two-day evidentiary hearing on the motion. On the first day of the hearing, the prosecutors informed the court that, overnight, they had been informed about additional information that had not been disclosed previously. The State explained the

2

measures prosecutors had taken so that they could be reasonably assured that they had received all discoverable information from the State's investigators and produced members of the MCU for questioning under oath by both parties regarding the failure of the MCU to turn over the investigative information at issue.

The State conceded "without reservation that it [had] severely violated [the trial] court's discovery orders in failing to provide [the defendant] with the investigative information at issue prior to the penultimate day of its case-in-chief." The only issue for the court, therefore, was "the remedy that [was] due." The trial court denied the defendant's motion to dismiss the indictments with prejudice in an October 31 order.

In its order, the court observed that, under the State Due Process Clause, "[d]ismissal with prejudice is generally reserved for extraordinary circumstances that involve . . . actual prejudice to the defendant caused by the delayed disclosure, and . . . an inability to cure the prejudice with other . . . curative measures." (Quotation omitted.) The court rejected the defendant's assertion that this case represents the "extraordinary situation" where dismissal with prejudice is warranted, noting that the State's discovery violations, although "inexcusable," were not the product of "malice, ill will, or bad faith," and that there was "simply no evidence from which it is reasonable to infer that the [MCU] or any other government actor was intentionally suppressing information favorable to [the defendant]." The court specifically found the government conduct in this case was "the product of sloppiness, [lack of] oversight, and poor management practices" principally of the lead MCU investigator, and implied that the conduct was not "intentionally unlawful."

Instead of dismissing the indictments, the court: (1) allowed the defense to make a new opening statement; (2) allowed the defense to play portions of certain recorded witness interviews and precluded the State from using information from those interviews; (3) allowed the defense to recall certain witnesses for impeachment purposes and precluded the State from rehabilitating those witnesses; (4) intended to instruct the jury that the government failed to meet its discovery obligations; and (5) required the State to provide signed affidavits from every MCU member who worked on the case averring that the member "has checked all personal and work related electronic devices to ensure that any and all materials related to this case have been provided to the Attorney General, and thus to the defense."

B. Second Motion to Dismiss

Before the court issued its narrative order, MCU initiated an audit of the investigation to ensure that all discovery was disclosed. The audit continued as the trial progressed. At the end of the day on October 30, the MCU informed

3

the prosecution that the audit had unearthed additional undisclosed discovery. The prosecution informed defense counsel of this fact, identified the additional undisclosed materials, and submitted some of them to defense counsel.

The next day, October 31, prosecuting attorneys told defense counsel in a telephone call that they were at State Police headquarters and had just learned, upon their arrival, that there was even more undisclosed discovery than they had previously identified. The prosecuting attorneys told defense counsel that they also had learned upon their arrival that the State Police kept all drug-related discovery separate from the homicide discovery and that the State Police had not turned over the drug investigation discovery to the prosecution. A prosecuting attorney told defense counsel that the volume of undisclosed discovery materials was "significant." In a subsequent email, defense counsel proposed that defense counsel request a mistrial and that, once all undisclosed discovery had been reviewed, the parties could litigate whether the mistrial should be with or without prejudice.

Thereafter, the defense requested a mistrial, and the State did not object. The State also argued that a mistrial was required by manifest necessity due to the "late discovery[] of potentially exculpatory evidence" and defense counsel's representation that a continuance would not be a viable option. The State agreed to waive any procedural objections it might have to the defendant's renewed motion to dismiss should the court declare a mistrial and should the defendant subsequently move to dismiss the indictments with prejudice. The court granted the assented-to request for a mistrial on October 31, and dismissed the jury.

In the ensuing months, the defense team reviewed the additional undisclosed discovery, amounting to hundreds of written pages and more than 25 media discs. The undisclosed discovery included information previously unknown to defense counsel.

In May 2020, the defendant filed a second motion to dismiss the charges pending against him with prejudice based upon the double jeopardy protections of Part I, Article 16 of the State Constitution and the Fifth Amendment to the Federal Constitution and the State and Federal Due Process Clauses, see N.H. CONST. pt. I, art. 15; U.S. CONST. amend. XIV. The defendant argued that the "State . . . engaged in conduct intended to provoke the defense into requesting a mistrial" and that it engaged in a pattern "of reckless disregard" of its constitutional obligations to disclose, before trial, information favorable to the defense that is material to guilt or punishment. The defendant contended that the State's conduct "severely prejudic[ed] [his] defense" and required dismissal with prejudice.

In its objection, the State conceded that "[i]nexcusable [d]iscovery violations . . . for which the State is solely at fault" had occurred in the case.

4

However, the State contended that very little of the previously undisclosed information could be considered favorable to the defendant and material to guilt or punishment and that the previously undisclosed information was "duplicative in substance to a host of information already provided to the defense in a timely manner." The State further asserted, "[a]lthough the acknowledged [d]iscovery violations in this case have been serious, they were neither willful nor malicious, and were the product of unique and unprecedented negligen[ce] . . . rather than systematic dysfunction by either police or prosecutors." The State argued that the violations did not prejudice the defendant "to the extent that the only available recourse is dismissal with prejudice," and asserted there were "many available alternative and effective remedies and sanctions that the [court could] impose short of such an extreme penalty." For example, the State agreed that "as an appropriate additional sanction," the State would "cover the cost of any additional Discovery depositions, travel expenses, and/or litigation expenses," and that, in the retrial, "the State would waive its valid availability objection to [certain] previously-admitted hearsay statements."

Following a three-day evidentiary hearing, the Trial Court (Howard, J.) denied the defendant's motion to dismiss the indictments with prejudice. In its narrative order, the court described the inadequate record-keeping system used by the MCU, which led to the discovery failures in this case. As described by the court, the MCU uses a record-keeping system in which all physical discovery — including written reports, items from the crime scene, and discs containing recorded interviews or surveillance footage — is compiled into a physical binder called a "casebook." The casebook then is turned over to the prosecuting body, which, in homicide cases, is usually the Attorney General's Office. Any materials that are not included in the casebook remain in the possession of the lead MCU investigator; however, there is no inventory system for such materials. The MCU has no designated procedures for compiling a casebook and offers no formal training on the subject.

Additionally, the MCU has no centralized records management system. The lead MCU investigator assigned to this case used a spreadsheet to track investigator assignments and testified that if he inadvertently excluded an investigative task from his spreadsheet, he would have no indicator or reminder to follow-up on the task's completion. In other words, a failure to record an item onto the spreadsheet would likely result in a failure to collect the item. The lead MCU investigator admitted that his record-keeping practices fell short, but testified that his shortcomings were not the result of an intentional effort to prevent information from being disclosed to the Attorney General's Office or defense counsel. The trial court found this testimony to be credible and reliable.

The court noted that the State did not dispute that it had "committed significant discovery violations" and that the only issue before the court was

the proper remedy for those violations. The court rejected the defendant's double jeopardy argument on the ground that there was no evidence that the State had intentionally goaded him into moving for a mistrial. Regarding the defendant's due process claim, the court appears to have assumed without deciding that, as the defendant asserted, the newly disclosed information was favorable to him and was material to guilt or punishment. The court then rejected his due process argument on two grounds: (1) the defendant suffered no actual prejudice from the delayed disclosures; and (2) there was no evidence that the State had intentionally withheld evidence in order to obtain a certain trial result. Nonetheless, the court determined that "the less extreme sanction of a new trial can sufficiently cure any potential prejudice [the defendant] suffered" because of the delayed disclosures. The court afforded the defendant 30 days to file a supplemental pleading concerning alternative remedies for the State's discovery violations.

Rather than propose alternative remedies, the defendant filed a motion for reconsideration and a motion for additional findings of fact. In its motion for additional factual findings, the defendant observed that "apart from finding no intentional [mis]conduct, the court's order [made] no finding with respect to anyone's mental state or level of culpability (e.g., accident, mistake, or misfortune; poor recordkeeping; simple negligence; gross negligence; reckless disregard)," and that it was "not clear whether or to what degree any prosecutor was at fault." Therefore, the defendant requested the court to "[r]ender findings on what the discovery violations were, who bore responsibility for [them], and the degree of culpability associated with the violations." The trial court denied the defendant's motions in a margin order. This appeal followed.

II. Analysis

We review the trial court's denial of the defendant's motion to dismiss following a mistrial under our unsustainable exercise of discretion standard. State v. Murray, 153 N.H. 674, 679 (2006); see State v. Belton, 150 N.H. 741, 745 (2004) (explaining that we review the trial court's decision to impose discovery sanctions under our unsustainable exercise of discretion standard). In determining whether a trial court ruling is an unsustainable exercise of discretion, we consider "whether the record establishes an objective basis sufficient to sustain the discretionary judgment made." State v. Lambert, 147 N.H. 295, 296 (2001). To show that the trial court's decision is unsustainable, a party "must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of [that party's] case." Id. (quotation omitted).

On appeal, the defendant argues that the Double Jeopardy Clauses and Due Process Clauses of the State and Federal Constitutions required the trial court to dismiss his pending indictments with prejudice and that the trial court erred by declining to do so. See N.H. CONST. pt. I, arts. 15, 16; U.S. CONST.

6

amends. V, XIV.  We first consider his arguments under the State Constitution and cite federal opinions for guidance only.  State v. Ball, 124 N.H. 226, 231-33 (1983).  We first address his double jeopardy arguments.

A.  Double Jeopardy

The Double Jeopardy Clauses of the State and Federal Constitutions prohibit the State from placing a defendant in jeopardy more than once for the same offense.  State v. Ojo, 166 N.H. 95, 98 (2014) (State Double Jeopardy Clause); see Currier v. Virginia, 138 S. Ct. 2144, 2149 (2018) (Federal Double Jeopardy Clause).  "A defendant is placed in jeopardy when a jury is empaneled and sworn, or, in the case of a bench trial, when the judge begins to hear evidence."  Ojo, 166 N.H. at 98 (citation omitted).  "After jeopardy attaches for a particular offense, it 'terminates' — thereby prohibiting retrial for the same offense — upon a judgment of acquittal or conviction, or upon an unnecessarily declared mistrial preventing either judgment."  Id. (citation, quotation, and ellipsis omitted).

However, when the defendant requests a mistrial, double jeopardy does not bar retrial unless "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial."  Oregon v. Kennedy, 456 U.S. 667, 679 (1982) (discussing the Federal Double Jeopardy Clause); State v. Glenn, 160 N.H. 480, 489 (2010) (discussing the State Double Jeopardy Clause).  This exception to the rule that the Double Jeopardy Clause is no bar to retrial is a narrow one.  Kennedy, 456 U.S. at 673.  "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion."  Id. at 676; see State v. Duhamel, 128 N.H. 199, 202-03 (1986) (adopting this standard under the State Constitution).

"Goading" for the purposes of establishing that double jeopardy bars retrial "is narrowly defined."  United States v. Buck, 847 F.3d 267, 272 (5th Cir. 2017) (quotation omitted).  "[G]ross negligence by the prosecutor, or even intentional conduct that seriously prejudices the defense, is insufficient to be characterized as goading."  Id. (quotations omitted); see Murray, 153 N.H. at 681-82.  "Prosecutorial conduct that might be viewed as harassment or even overreaching, even if sufficient to justify a mistrial on defendant's motion," is not goading.  Kennedy, 456 U.S. at 675-76; see Murray, 153 N.H. at 681-82. Instead, there must be "intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause."  Kennedy, 456 U.S. at 675-76 (referring to the Federal Double Jeopardy Clause); accord State v. Marti, 147 N.H. 168, 173 (2001) ("For retrial to be barred, the prosecutor's aim must be to subvert the protections of double jeopardy.").  Prosecutorial intent may be inferred from "objective facts and circumstances."  Kennedy, 456 U.S. at 675.

7

"Whether the prosecution intended to provoke a mistrial is a question of fact to be decided by the trial court." Murray, 153 N.H. at 679. "We accept the trial court's factual findings unless they are unsupported by the evidence in the record," id., or are legally erroneous, State v. Willis, 165 N.H. 206, 211 (2013).

On appeal, the defendant asserts that the evidence "establishe[d] that the prosecution acted either with reckless disregard for the contents of the undisclosed discovery, or in gross dereliction of its responsibility to deliver accurate and reliable information to the defense as it decided whether to terminate the trial" and asks that we "find that the intent element can be satisfied" by proof that the prosecution was aware of, but consciously disregarded, "the risk that [its] conduct would cause a mistrial." In other words, the defendant asks that we construe our State Constitution to provide greater protection than the Federal Constitution under these circumstances. Although retrial is barred under the Federal Constitution only upon evidence that the prosecution specifically intended to goad a defendant into moving for a mistrial, see Kennedy, 456 U.S. at 675-76, the defendant asks that we construe the State Constitution to bar retrial also when the prosecution has consciously disregarded the risk that its conduct would cause a mistrial.

Since the Supreme Court decided Kennedy, only a handful of state supreme courts have adopted the "conscious disregard" standard or something similar to it under their state constitutions. See Pool v. Superior Court, 677 P.2d 261, 271-72 (Ariz. 1984); State v. Breit, 930 P.2d 792, 803 (N.M. 1996); Thomas v. Eighth Judicial District Court, 402 P.3d 619, 626 (Nev. 2017); State v. Kennedy, 666 P.2d 1316, 1326 (Or. 1983). By contrast, "[a] majority of state courts have adopted the Kennedy standard under their state constitutions." Emily McEvoy, When Double Jeopardy Should Bar Retrial In Cases of Prosecutorial Misconduct: A Call for Broader State Protections, 122 Colum. L. Rev. 173, 188 (2022); see, e.g., State v. Michael J., 875 A.2d 510, 534-35 (Conn. 2005) (concluding that the Kennedy standard applies under the Connecticut Constitution).

In Duhamel, we adopted the Kennedy specific intent standard as a matter of State constitutional law, reasoning that our State Constitution provides identical protection as is provided by the Federal Constitution under these circumstances. Duhamel, 128 N.H. at 202-03; see Marti, 147 N.H. at 171.[1] Similarly, in Murray, we rejected the defendant's argument that the State Constitution afforded him greater protection than the Federal

---

[1] In Marti, we were asked to adopt the "conscious disregard" standard that the defendant urges us to adopt today. See Marti, 147 N.H. at 173. In that case, we applied the Kennedy specific intent standard to the question of whether a retrial is barred after a defendant's conviction has been reversed because of prosecutorial misconduct and saw no need to decide whether to adopt the "conscious disregard" standard because, even under that standard, the defendant did not prevail. Id.

8

Constitution in the context of a motion to dismiss following mistrial. Murray, 153 N.H. at 677, 681. The defendant in Murray argued that "although Kennedy holds that the Federal Constitution bars retrial only upon a showing of intentional prosecutorial misconduct, [because] the New Hampshire Constitution affords him greater protection," retrial is barred when "the prosecutor's conduct amounted to prosecutorial gross negligence." Id. at 681. We disagreed, reaffirming that retrial is barred only upon a showing of intentional prosecutorial misconduct. See id.

Consistent with our decisions in Duhamel and Murray, we decline the defendant's invitation to adopt the "conscious disregard" standard under our State Constitution. Therefore, we hold that the defendant's assertions that the "prosecution acted either with reckless disregard for the contents of the undisclosed discovery, or in gross dereliction of its responsibility to deliver accurate and reliable information to the defense," even if true, are insufficient as a matter of law to establish that the State acted with the requisite specific intent.

Similarly insufficient as a matter of law are the defendant's contentions that, because of the State's discovery violations, he "had no reasonable option but to request a mistrial," and that "the State benefitted from the decision" to grant a mistrial. For retrial to be barred by double jeopardy, the defendant must show more than that the State's conduct "painted [him] into a corner" such that a successful motion for mistrial is "the only reasonable means of extrication." State v. Montella, 135 N.H. 698, 700 (1992). Rather, he must show that the State painted him into that corner "by . . . design," or put another way, that the State intentionally goaded him into requesting a mistrial. Id. at 700, 701.

Here, the trial court found that "the State did not intend to goad the defense into requesting a mistrial." Although the defense had contended that the State intended its representations in the October 31, 2019 phone call to goad the defense into requesting a mistrial, the court was "unpersuaded." The court found that, in that phone call, prosecuting attorneys were merely attempting to comply with their obligation to disclose potentially exculpatory and material information by "expedient[ly]" notifying defense counsel of the newly discovered undisclosed materials. The court further found that defense counsel was considering moving for a mistrial before October 31, and that the State offered not to oppose a mistrial motion "out of a genuine recognition that if the defense needed a cessation of the trial to digest the new discovery, the State was simply not in a position to oppose any such request."

In addition, the trial court found "credible and reliable" the testimony of the lead MCU investigator that his conduct was not "part of any effort to intentionally withhold evidence [from] the Attorney General's office and, in

9

turn, the defendant." The court determined that "no other testimony provided at the hearing illustrates any intentional withholding of evidence from the defendant or to encourage a certain trial result."

The court also incorporated by reference its findings regarding the State's intent from its order denying the defendant's first motion to dismiss. Specifically, the court incorporated its prior findings that: (1) "[n]otwithstanding the egregious nature of the failures of the [MCU] to meet fundamental discovery obligations, . . . there was no bad faith or intent to deprive the defense of the evidence"; (2) "there is simply no evidence from which it is reasonable to infer that the [MCU] or any other government actor was intentionally suppressing information favorable to [the defendant]"; (3) the government conduct in this case, although "inexcusable," was not "intentionally unlawful," but rather "was the product of sloppiness, [lack of] oversight, and poor management practices"; and (4) the government conduct in this case was not the product of "malice, ill will, or bad faith."

The defendant challenges the trial court's decision to credit the testimony of the prosecuting attorneys. However, we defer to the trial court's credibility determinations unless no reasonable person could come to the same conclusion. State v. Livingston, 153 N.H. 399, 402 (2006). Based upon our review of the record, we conclude that a reasonable person could have found the prosecutors' testimony to be credible, and, thus, we will not substitute our own credibility determination for that of the trial court. Our review of the record also reveals support for the trial court's finding that the State did not intentionally goad the defendant into moving for a mistrial.

Therefore, we uphold the trial court's determination that the State Double Jeopardy Clause does not bar the defendant's retrial. Because the Federal Double Jeopardy Clause affords him no greater protection than the State Double Jeopardy Clause under these circumstances, see Kennedy, 456 U.S. at 675-76; Duhamel, 128 N.H. at 202-03, we necessarily reach the same conclusion under both constitutions.

B. Due Process

The State and Federal Due Process Clauses require the State to disclose information favorable to the defendant that is material to guilt or punishment. Duchesne v. Hillsborough County Attorney, 167 N.H. 774, 777 (2015); see Brady v. Maryland, 373 U.S. 83, 87 (1963). Favorable evidence is "material" if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different. See Kyles v. Whitley, 514 U.S. 419, 433-34 (1995); State v. Lucius, 140 N.H. 60, 63-64 (1995).

Under the Federal Constitution, the defendant has the burden of proving that the evidence is "material." State v. Laurie, 139 N.H. 325, 330 (1995). In

Laurie, we found that this imposes "too severe a burden on defendants" and "that the New Hampshire constitutional right to present all favorable proofs affords greater protection to a criminal defendant" than the Federal Constitution provides. Id. Accordingly, we held that, under the State Constitution, once the defendant has shown "that favorable, exculpatory evidence has been knowingly withheld by the prosecution, the burden shifts to the State to prove beyond a reasonable doubt that the undisclosed evidence would not have affected the verdict." Id.; see Lucius, 140 N.H. at 63-64. Under both the State and Federal Constitutions, the prosecutor need not "disclose everything that might influence a jury," and the defendant is not entitled to "a complete discovery of all investigatory work or an examination of the State's complete file." Laurie, 139 N.H. at 330; see United States v. Bagley, 473 U.S. at 667, 675 (1985); Moore v. Illinois, 408 U.S. 786, 795 (1972).

"The duty to disclose encompasses both exculpatory information and information that may be used to impeach the State's witnesses and applies whether or not the defendant requests the information." Duchesne, 167 N.H. at 777 (citations omitted). "The duty of disclosure falls on the prosecution, and is not satisfied merely because the particular prosecutor assigned to the case is unaware of the existence of the exculpatory information." Id. at 777-78 (citations omitted); see Giglio v. United States, 405 U.S. 150, 154 (1972). Rather, we impute knowledge among prosecutors in the same office, Duchesne, 167 N.H. at 778, and hold them responsible for the information possessed by "any investigating officer or law enforcement official," State v. Lavallee, 145 N.H. 424, 427 (2000); see Lucius, 140 N.H. at 63. "Although police may sometimes fail to inform a prosecutor of all they know," such an omission does not relieve prosecutors of their "duty to learn of any favorable evidence" in the possession of the police. Duchesne, 167 N.H. at 778 (quotations omitted). The government's failure to disclose favorable, material information to the defense is referred to as a "Brady violation." See State v. Roy, 167 N.H. 276, 290-91 (2015); see Brady, 373 U.S. at 87. For the purposes of this appeal, we will assume without deciding that the information the State disclosed mid-trial constituted information favorable to the defendant that was material to guilt or punishment.

When a first trial has ended in a conviction, "the remedy for a Brady violation typically is a new trial." Woodfox v. Cain, 609 F.3d 774, 802 (5th Cir. 2010); see United States v. Davis, 578 F.2d 277, 280 (10th Cir. 1978) (explaining that "a violation of due process under Brady does not entitle a defendant to an acquittal, but only to a new trial in which the convicted defendant has access to the wrongfully withheld evidence"). However, courts in some jurisdictions have ruled that, when a first trial has ended in conviction, dismissal of the defendant's pending indictments with prejudice may be the proper remedy under certain circumstances. See, e.g., Government of Virgin Islands v. Fahie, 419 F.3d 249, 255 (3d Cir. 2005) ("While retrial is normally the most severe sanction available for a Brady violation, where a defendant can

11

show both willful misconduct by the government, and prejudice, dismissal may be proper."); United States v. Pasha, 797 F.3d 1122, 1139 (D.C. Cir. 2015) (deciding that "if the lingering prejudice of a Brady violation has removed all possibility that the defendant could receive a new trial that is fair, the indictment must be dismissed"); United States v. Bundy, 968 F.3d 1019, 1031 (9th Cir. 2020) ("Only where the government withheld Brady material through flagrant misconduct, causing substantial prejudice to the accused," should the court "exercise . . . its supervisory powers to dismiss the case with prejudice." (quotations omitted)).

The defendant argues that dismissal of his pending indictments was required because "the level of misconduct here" by the State "is exceptional" and "without precedent." He contends that there were "institutional failures" in this case, and that "the MCU and Attorney General delegated the investigation of the 'drug angle' [of the case] to federal authorities," specifically, to ensure that the defense "would receive no discovery of what the [federal authorities] uncovered." However, the trial court made no such factual findings, and we are not persuaded that the evidence would compel any such findings.

The defendant faults the trial court for "adopt[ing] the [State's] characterization of [the lead MCU investigator] as . . . bumbling but not ill-intentioned." The lead MCU investigator testified at the three-day hearing on the defendant's motion to dismiss and, the trial court, having presided over that hearing and observed the testimony, was in the best position to assess his credibility. Based upon our review of the record, we have no reason to substitute our own credibility determination for that of the trial court. See Livingston, 153 N.H. at 402.

The defendant also faults the trial court for concluding "that there was either no or minor misconduct." We do not share his interpretation of the trial court's order. See In the Matter of Sheys & Blackburn, 168 N.H. 35, 39 (2015) ("The interpretation of a court order is a question of law, which we review de novo."). Rather, the trial court described as undisputed the fact "that the State committed significant discovery violations in this case."

The defendant next contests the trial court's determination that a new trial would sufficiently cure any potential prejudice he suffered as a result of the State's delayed disclosures. According to the defendant, the trial court "discounted prejudice because the defense has the discovery now." Again, we do not share his interpretation of the trial court's order. See id. The court found that the newly disclosed information was "largely cumulative of timely-disclosed discovery materials" and that the defendant's "assertions of actual prejudice" were "speculative, vague, and lacking in articulation of how he would have altered his trial strategy in light of the untimely-disclosed materials." The defendant's bare conclusion that his lack of prior access to the

information "was undeniably prejudicial" fails to persuade us that the trial court's findings lack support in the record or are legally erroneous.  See Willis, 165 N.H. at 211.

For all of the above reasons, we uphold the trial court's determination that the defendant was not entitled to dismissal with prejudice of his pending indictments under the State Due Process Clause.  Because the Federal Due Process Clause affords him no greater protection than the State Due Process Clause under these circumstances, see Kyles, 514 U.S. at 433-34; Laurie, 139 N.H. at 330, we necessarily reach the same conclusion under both constitutions.

Although we affirm the trial court's decision not to impose the harshest of penalties — the dismissal of the defendant's pending charges — we do not condone the State's conduct.  See State v. Cotell, 143 N.H. 275, 281 (1998).  As the trial court found, and as the record supports, "there is no doubt [the defendant] was entitled to [the newly discovered] materials."

At the same time, we decline the defendant's invitation to "establish, as a principle governing the remand, that misconduct greater than culpable negligence occurred."  In his motion for additional factual findings, the defendant noted that the trial court made "no finding with respect to anyone's mental state or level of culpability," other than to find "no intentional [mis]conduct."  To the extent that he now urges this court to make the additional factual findings he requested of the trial court, we decline to do so. We also decline to determine whether remedies short of dismissal should be imposed for the State's discovery violations.  We leave that determination to the trial court in the first instance.  In light of our decision, we vacate the trial court's denial of the defendant's motion for additional findings, and remand for additional proceedings consistent with this opinion.

Affirmed in part; vacated in part; and remanded.

BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.